**UNITED STATES of America, Plaintiff,**

v.

**Joseph B. PETRELLI, et al.,
Defendants.**

**No. C85–3903A.**

United States District Court,
N.D. Ohio, E.D.

Jan. 30, 1986.

Richard J. French, Cleveland, Ohio, Daniel T. Hartnett, Karen R. Osborne, Trial Attys., Tax Div., U.S. Dept. of Justice, Washington, D.C., for plaintiff.

Joseph B. Petrelli, Akron, Ohio, pro se.

## MEMORANDUM OPINION

DOWD, District Judge.

Plaintiff, the United States of America, filed this action against the defendants, Joseph B. Petrelli, *et al.*, on December 23, 1985, seeking a permanent injunction and other equitable relief for the defendants' alleged organization and/or sale of allegedly abusive tax shelters involving artwork plates. On December 24, 1985, this Court held a hearing on the plaintiff's motion for a temporary restraining order restraining the defendants from their allegedly unlawful conduct in organizing and selling the tax shelters in question. On January 2, 1986, this Court held a hearing on the plaintiff's motion for a preliminary injunction to enjoin the defendants from continuing their activity with the same. Based upon the evidence and the testimony introduced at the hearings on the motions for a temporary restraining order and a preliminary injunction in this action, the Court makes the following findings of fact and conclusions of law, from which it concludes that plaintiff's motion for injunctive relief should be granted.

## FACTUAL BACKGROUND

Plaintiff filed this complaint against Joseph B. Petrelli, also known as Joseph L. Fitzhugh, individually and doing business as International Antique Publications, Native American Originals, Inc., and American Antique Publishing Company. The tax shelters offered by defendant Petrelli and the defendant corporations involve the lease by the defendants to investors of master negatives and plates[1] made from glass photographic slides depicting scenes from the southwest United States during the late nineteenth century.

Under the Internal Revenue Code of 1954, as amended, the purchasers of certain assets may take an investment tax credit in an amount which generally equals ten percent of the basis of the eligible property against their federal tax liability. *See* 26 U.S.C. §§ 38, 46–48. Under proper circumstances, the purchaser of the asset may lease the asset and pass the investment tax credit attributable to the acquisition of the asset through to the lessee. *See* 26 U.S.C. § 48(d). Plaintiff purports to lease the master photographs and plates in question to lessees who take investment tax credits on the asset.[2]

---

1. Defendant Petrelli argues that what he leased was a master negative, which could later be converted into metal plates for reproduction. However, the Court's review of the evidence and testimony before it, including several lease agreements between the defendant companies and investors, persuades the Court that investors participating in the defendants' leasing scheme leased a master photograph and a metal plate for reproduction.

2. The mechanics of the plan are explained in Exhibit A to the January 13, 1986 memorandum of the defendants filed in response to the Court's Order of January 7, 1986. Defendants state that Exhibit A, entitled "Explanation Of Mechanics: How It Works," "was given to every investor." In that Exhibit, appended to this opinion as Appendix 1, defendants state that an investor who participates in the defendants' leasing scheme will receive a $19,000.00 investment tax credit where he leases a "Master" with a fair market value of $190,000.00. Defendants further state:

Professor Olaf H. Prufer, Ph.D., Chairman of the Department of Sociology and Anthropology at Kent State University, Kent, Ohio, acquired the slides in question in 1962 or 1963 at Case Institute of Technology in Cleveland, Ohio, where he was a member of the faculty. Professor Prufer was interested in the slides for their anthropological value in depicting old scenes of southwestern Indians. The slides had been thrown out as valueless and Professor Prufer "literally rescue[d] them from the garbage bin." Professor Prufer occasionally used the slides in his lectures, but found it difficult to locate suitable projectors for their use because of their age.

When Professor Prufer became a professor at Kent State University in about 1971 or 1972, he decided to "clean out [his] accumulated varia of decades in Anthropology," and gave the slides to Bruce Ferrini, his student, who had expressed an interest in the slides. In order to later make use of some of the scenes depicted in the slides, Professor Prufer made copies of about 58 of the slides.

Ostensibly, the defendants' scheme involved making metal plates from master negatives of the glass slides for the purpose of making reproductions. Lessees of the master plates and negatives would then sell these reproductions to the public. Reproductions are generated from the plates by pressing a piece of paper onto their ink covered surfaces. In this manner, plates are used to create multiple impressions of the same image.

The investigative division of the Internal Revenue Service (hereinafter "I.R.S.") led the I.R.S. to the printing services which made photographic negatives of the original slides, from which the plates were then made. A survey of these printing services revealed that altogether, the defendant corporation Native American Originals, Inc. manufactured or caused to be manufactured plates from approximately 14 images. The defendant corporation American Antique Publishing Company manufactured or caused to be manufactured plates from approximately 12 images in 1984. The defendant corporation International Antique Publications has not manufactured or caused to be manufactured any plates at all.

Defendants then entered into lease agreements with investors who leased master photographs and plates from the defendants. Defendants advised the lessees of the master photographs and plates to claim investment tax credits and deductions for the leased art work and plates allegedly made therefrom, some of which never existed.

On August 31, 1983, as part of its investigation of the defendants, I.R.S. agent William Milcetich questioned Professor Prufer as to the value of these slides which he had earlier given Ferrini. Professor Prufer told Milcetich that he personally would probably pay about $25.00 to $50.00 for a slide and that local buffs in the southwest, depending upon the subject of the slide, might pay as much as $100.00. However, Prufer stated that he was not qualified to give a professional appraisal. He stated that he believed the slides might be worth much less than he had opined, but doubted that they would be worth any more.

Sometime after the I.R.S. began to investigate the defendants for their allegedly fraudulent dealings, the defendant Petrelli contacted Professor Prufer and asked him what he had told the I.R.S. Professor Prufer related the substance of his conversation with I.R.S. agent Milcetich to Petrelli, which infuriated Petrelli. Petrelli threatened Prufer that he would lose his professional reputation in evaluating the slides at $25.00, although Prufer attempted to explain to Petrelli that he had not made that statement. Petrelli then offered to compensate Prufer for retracting his earlier valuation of the slides. Petrelli also unsuccessfully tried to restrain Prufer

In a fifty percent (50%) tax bracket, this is equivalent to a deduction of Thirty–Eight Thousand Dollars ($38,000.00) which, when added to the appropriate rental deduction and distribution costs incurred by the Taxpayer/Lessee, can provide an equivalent of approximately a FOUR TO ONE (4:1) RATE OF RETURN RATIO.

from engaging in conversation with the I.R.S., and requested that Prufer let Petrelli know if and when the I.R.S. contacted him. He told Prufer that six million dollars was involved.

Subsequent to the I.R.S. investigation of the defendants' tax shelter schemes, the I.R.S. halted the tax refunds of investors who participated in the schemes. On July 24, 1985, defendant Petrelli offered I.R.S. agent David Marzich the sum of $25,000.00 to cause the refunds to be processed and to cause the I.R.S. to write a letter to investors notifying them that the credits and deductions which were attributable to defendants' tax shelters would be allowed. Defendant Petrelli paid Marzich an installment of $5,000.00 on the promised $25,000.00. The defendants have until now, and are currently, engaged in organizing and selling lease interests in the above-explained tax shelters.

## DISCUSSION AND LAW

The Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1340 and 1345 and 26 U.S.C. §§ 7402 and 7408.

Plaintiff asserts the defendants' liability under 26 U.S.C. §§ 6700, 6701, 7402, and 7408 of the Internal Revenue Code of 1954.

The terms of 26 U.S.C. § 6700 proscribe the promotion of abusive tax shelters. Under 26 U.S.C. § 6700(a)

Any person who—

(1)(A) organizes (or assists in the organization of)—

(i) a partnership or other entity,

(ii) any investment plan or arrangement, or

(iii) any other plan or arrangement, or

(B) participates in the sale of any interest in an entity or plan or arrangement referred to in subparagraph (A), and

(2) makes or furnishes (in connection with such organization or sale)—

(A) a statement with respect to the allowability of any deduction or credit, the excludability of any income, or the securing of any other tax benefit by

reason of holding an interest in the entity or participating in the plan or arrangement which the person knows or has reason to know is false or fraudulent as to any material matter, or

(B) a gross valuation overstatement as to any material matter,

shall pay a penalty equal to the great of $1,000 or 20 percent of the gross income derived or to be derived by such person from such activity.

The terms of 26 U.S.C. § 6701 set forth the penalties for aiding and abetting the understatement of tax liability. Under 26 U.S.C. § 6701(a),

Any person—

(1) who aids or assists in, procures, or advises with respect to, the preparation or presentation of any portion of a return, affidavit, claim, or other document in connection with any matter arising under the internal revenue laws,

(2) who knows that such portion will be used in connection with any material matter arising under the internal revenue laws, and

(3) who knows that such portion (if so used) will result in an understatement of the liability for tax of another person,

shall pay a penalty with respect to each such document in the amount determined under subsection (b).

Subsection (a) applies "whether or not the understatement is with the knowledge or consent of the persons authorized or required to present the return, affidavit, claim, or other document." 26 U.S.C. § 6701(d).

Under 26 U.S.C. § 7402(a), district courts are empowered to make and issue injunctions in civil actions as necessary or appropriate to enforce internal revenue laws. The terms of 26 U.S.C. § 7408(a) provide that "A civil action in the name of the United States to enjoin any person from further engaging in conduct subject to penalty under section 6700 ... or section 6701 ... may be commenced at the request of the Secretary." Under 26 U.S.C. § 7408(b),

if the Court finds that a person has engaged in unlawful conduct under § 6700 or § 6701, and that injunctive relief is appropriate to prevent the recurrence of such conduct, the Court may enjoin the person from engaging in that conduct.

The terms of 26 U.S.C. § 7408 clearly set forth the requirements for injunctive relief for a violation of 26 U.S.C. §§ 6700 and 6701. Therefore, the standard requirements for equitable relief in this circuit need not be satisfied. *See Trailer Train Co. v. State Board of Equalization*, 697 F.2d 860, 869 (9th Cir.1983), *cert. denied*, 464 U.S. 846, 104 S.Ct. 149, 78 L.Ed.2d 139 (citing *Atchison, Topeka & Santa Fe Railroad Co. v. Lennen*, 640 F.2d 255, 258–61 (10th Cir.1981)); *Commodity Futures Trading Commission v. Hunt*, 591 F.2d 1211, 1220 (7th Cir.1979); *see also Securities & Exchange Commission v. Management Dynamics, Inc.*, 515 F.2d 801, 808 (2d Cir.1975). "Once a violation is demonstrated, the moving party need only show that there is some reasonable likelihood of future violations." *Commodity Futures Trading Commission v. Hunt, supra*, (citations omitted). "When an injunction is explicitly authorized by statute, proper discretion usually requires its issuance if the prerequisites for the remedy have been demonstrated and the injunction would fulfill the legislative purpose." *Donovan v. Brown Equipment & Service Tools, Inc.*, 666 F.2d 148, 157 (5th Cir.1982) (citations omitted).

Under 26 U.S.C. § 7408, the first requirement for injunctive relief is that a person has engaged in conduct which is subject to penalty under 26 U.S.C. §§ 6700 or 6701. The Court finds first that the defendants have engaged in conduct which violates 26 U.S.C. § 6700 by fraudulently organizing and selling interests in tax shelters and falsely representing that credits and deductions against federal tax liability could be taken for interests in those tax shelters. Further, the defendants grossly overstated the value of the plates in question. Moreover, in making false statements in connection with the claiming of credits and deduc-

tions for interests in their tax shelter programs, the defendants engaged in conduct which violates 26 U.S.C. § 6701 by causing the understatement of another person's tax liability.

It is beyond dispute that the defendant Petrelli has sold interest in tax shelters offered by the three corporations, International Antique Publications, Native American Originals, Inc., and American Antique Publishing Company, in 1982, 1983, 1984, and 1985. On or about July 11, 1985, the defendant Petrelli sold an interest in a tax shelter program offered by International Antique Publications to Internal Revenue Service Special Agent Patrick Day, who was working under cover.

In total, for the years 1982, 1983, 1984, and 1985,[1] defendants Petrelli and Native American Originals, Inc., leased approximately 90 plates to at least 20 investors. Defendants Petrelli and Antique Publishing Company leased approximately 138 plates to at least 36 investors. Defendants Petrelli and International Antique Publications leased approximately 181 plates to about 37 investors. In total, as noted earlier, only 26 images were ever actually made into printing plates (14 for Native American Originals and 12 for American Antique Publishing) for promotion.

The appraisal of Leonard S. Barton, currently vice-president of the American Library of Colored Slide Co., Inc. and American Archives of World Art, establishes that the defendants have grossly overstated the correct values of the plates allegedly leased by American Antique Publishing Company and International Antique Publications (by 57,750 percent) and Native American Originals, Inc., (by 594,170 percent). Defendants have thus far exceeded the 200 percent overstatement requirements of 26 U.S.C. § 6700(a)(2)(B).

The Court thus concludes that the defendants falsely and fraudulently made material statements regarding the allowability of deductions and credits in the course of selling a tax-sheltered investment. Specifically, the defendants knowingly leased art

---

1. All sales occurred after September 4, 1982, the effective date of the Tax Reform Act of 1982.

work plates which for the most part never existed, or, when they did, were grossly overvalued. The defendants have thus clearly engaged in conduct which is subject to penalty under 26 U.S.C. §§ 6700 and 6701.

The second requirement for injunctive relief under 26 U.S.C. § 7408 is that injunctive relief is appropriate to prevent a recurrence of the conduct in question. In determining whether there is a likelihood of the recurrence of the harmful conduct, the Court may focus upon the past history of the person whose conduct is such to be enjoined to establish a likelihood of recurrence. *See Commodity Futures Trading Commission v. Hunt, supra,* at 1220; *Securities & Exchange Commission v. Management Dynamics, Inc., supra,* at 807. "In drawing the inference from past violations that future violations may occur, the court should look at the 'totality of circumstances, and factors suggesting that the infraction might not have been an isolated occurrence are always relevant.'" *Commodity Futures Trading Commission v. Hunt, supra,* citing *Securities and Exchange Commission v. Management Dynamics, Inc., supra.* Specifically,

> In predicting the likelihood of future violations, a court must assess the totality of the circumstances surrounding the defendant and his violation, including such factors as the gravity of harm caused by the offense; the extent of the defendant's participation and his degree of scienter; the isolated or recurrent nature of the infraction and the likelihood that the defendant's customary business activities might again involve him in such transactions; the defendant's recognition of his own culpability; and the sincerity of his assurances against future violations.

*Securities and Exchange Commission v. Holschuh,* 694 F.2d 130, 144 (7th Cir.1982) (citing *Commodity Futures Trading Commission v. Hunt, supra* ).

The Court finds that the defendants acted with knowledge in selling the tax shelter schemes involving artwork plates which are either nonexistent or overvalued, and systematically schemed to deprive the government of income tax through improperly claimed tax credits and deductions resulting from their fraudulent tax shelters. The defendants' previous conduct leads the Court to the conclusion that the defendants' past behavior is likely to recur. Defendant Petrelli has himself represented that he is currently engaged in selling the tax shelter schemes in question.

The legislative purpose behind the enactment of the statutes in question was to protect the integrity of the tax laws. The defendants have engaged in a course of conduct which has been calculated to harass, impede, impair, and substantially interfere with the administration and enforcement of the internal revenue laws. *See U.S. v. White,* 583 F.Supp. 1118, 1120 (D.Minn.1984). The conduct of defendant Petrelli in bribing special agent Marzich and threatening Professor Prufer is indicative of the course of conduct which the defendants have pursued. The Court thus finds that injunctive relief is appropriate to prevent the continuation, repetition, and proliferation of such conduct. *See id.* at 1121.

In accordance with the above opinion, the Court hereby orders as follows:

1. The defendants and/or their employees are hereby enjoined from further organizing or participating in the sale, lease, or offering for sale, of tax shelter schemes through the International Antique Publications, Native American Originals, Inc., and American Antique Publishing Company or otherwise.

2. The defendants and/or their employees are hereby enjoined from representing to any investor that s/he is entitled to federal income tax deductions or credits for his/her interest in a tax shelter, with the above companies, about which false statements and/or gross overvaluation statements were made.

3. The defendants and/or their employees are hereby enjoined from engaging in conduct which substantially interferes with the proper administration or enforcement of the internal revenue laws.

IT IS SO ORDERED.

## APPENDIX 1

### EXPLANATION OF MECHANICS:

### —HOW IT WORKS—

1. The Taxpayer leases a "MASTER" which he/she will exploit for profit through retail distribution for six (6) years.

2. The initial cost to the Taxpayer/Lessee, to be paid in advance in 1983, is Eleven Thousand Dollars ($11,000.00) for four (4) "MASTERS". This is the only out-of-pocket cost for the entire term of the Lease, with the exception of the obligation to pay ninety percent (90%) of the gross receipts from distribution and sales as additional rental during the term of the Lease.

3. There are NO NOTES for the Lessee to sign. The Lessor is at full risk because said Lessor has purchased each "MASTER" for cash and full recourse note.

4. TAX IMPACT: The Taxpayer/Lessee will receive in 1983 the full investment Tax Credit (ITC) "passed through" to him which is Nineteen Thousand Dollars ($19,000.00) in the case of the "MASTERS" with a fair market value of One Hundred Ninety Thousand Dollars ($190,000.00).

   In a fifty percent (50%) tax bracket, this is equivalent to a deduction of Thirty–Eight Thousand Dollars ($38,-000.00) which, when added to the appropriate rental deduction and distribution costs incurred by the Taxpayer/Lessee, can provide an equivalent of approximately a FOUR TO ONE (4:1) RATE OF RETURN RATIO.

5. THE TAXPAYER/LESSEE MUST BE IN THE BUSINESS ACTIVITY FOR A PROFIT AND MUST DISTRIBUTE HIS "MASTERS" ACTIVELY AND IN GOOD FAITH TO RECEIVE TAX BENEFITS.