Samuel I. SHUMAN, Adrian M. Shapiro and Texanna Art Trading Company, Inc., Plaintiffs–Appellees,

v.

UNITED STATES of America, Defendant–Appellant.

Samuel I. SHUMAN, Adrian M. Shapiro and Texanna Art Trading Company, Inc., Plaintiffs–Appellants,

v.

UNITED STATES of America, Defendant–Appellee.

Nos. 88–6118, 89–2235.

United States Court of Appeals, Fifth Circuit.

Jan. 5, 1990.

Janet A. Bradley, Atty., Gary R. Allen, Chief, Appellate Section, Tax Div., William S. Rose, Jr., Asst. Atty. Gen., Dept. of Justice, Jonathan S. Cohen, Atty, Washington, D.C., Henry K. Oncken, U.S. Atty., Houston, Tex., for Samuel I. Shuman, et al.

Robert D. Grossman, Jr., Grossman & Flask, Washington, D.C., for U.S.

Before DAVIS and SMITH, Circuit Judges, and LITTLE,[1] District Judge.

LITTLE, District Judge:

The plaintiffs in these consolidated cases are Samuel Shuman, Adrian Shapiro and a Texas corporation, Texanna Art Trading Company, Inc. The central issue is the alleged violation by the plaintiffs of a provision of the Internal Revenue Code. To unravel the skein, a recitation of the underlying facts is necessary.

Texanna purchased original lithographic or serigraphic plates from the creating artist. From these plates art prints are produced. The acquisition cost ranged between $44,000 and $85,000 per plate. A small cash payment and a long-term promissory note formed the essential components of each acquisition.

Texanna then sold the master plates to investors for prices ranging between $75,-000 and $150,000 per plate. The investor, as owner of the original plate, could then cause the artwork to be printed and distributed, presumably at a profit. The investor tendered a cash payment, executed one or more short-term promissory notes and a long-term promissory note. For example, Texanna acquired a plate from the original artist for $5,000 cash and a promissory note of $85,000. This plate was then sold by Texanna to an investor for $7,000 cash, and short-term promissory notes totaling $33,000 and a long-term promissory note for $110,000 (R. 90–91 and R. 480–481). The cost or price to the investor is his basis in the asset. That basis is the keystone for claiming depreciation and investment tax credit. If the item is grossly overvalued by

---

1. District Judge of the Western District of Louisiana, sitting by designation.

the seller, then deductions for depreciation and investment tax credit are unreal and produce distortions when reported by the investor. Intended to curb trafficking by promoters of overvalued investments, often referred to as tax shelters, is Section 6700 of the Internal Revenue Code. *See,* General Explanation of the Revenue Provisions of the Tax Equity and Fiscal Responsibility Act of 1982, prepared by the staff of the Joint Committee on Taxation, 31 December 1982 (R. 469). That section imposes a penalty on any person who participates in a plan, arrangement or entity to sell any interest in a plan, arrangement or entity, or furnishes in connection with the sale, a statement with respect to the tax benefits flowing to the purchaser which the person knows is false or fraudulent or "a gross valuation overstatement as to any material matter." The critical term "gross valuation overstatement" is defined in Section 6700(b)(1) as a statement which "exceeds 200% of the amount determined to be the correct valuation...." The penalty of Section 6700 was imposed on the three plaintiff taxpayers for their involvement in promoting and selling the master plates to various investors.

The taxpayers paid the penalties and filed refund claims which were denied. The taxpayers seek recovery of the penalties paid under protest asserting that they did not make gross valuation overstatements of the master plates or the plans to the investors.

The government's expert witness submitted a report and an affidavit as to the value of the master plates and the plan to be utilized by the investors who would acquire those plates. An essential ingredient to the government's case is proof that the value of the plate and plan as touted by the taxpayers exceeded 200% of the correct value. The taxpayers' motion for summary judgment asserted that the expert report was without foundation and could not form the basis for a factual dispute in that the expert reached the conclusion that the plates were not subject to valuation. Hence, the government failed to demonstrate that the plates had any value, let alone an excessive value, and therefore, the case should be dismissed. The district court granted summary judgment to the plaintiffs, reasoning in part: "Unless I simply accept uncritically, which I cannot do, his premises, there is nothing to indicate the value of these prints as 200%—the value put on by the plaintiffs is 200% of their fair market value and that for any commercial uses they lack value at least half of the taxpayers' evaluation." (Tr. 18). From that judgment the government appealed.

The reversal of the district court, about to be described, obviates our entertaining the district court's rejection of taxpayers' application for litigation costs and attorney fees as provided by Section 7430 of the Internal Revenue Code.

Viewing, as we must, the evidence and inferences from that evidence in a light most favorable to the government, we conclude that the district court erred in granting the taxpayers' summary judgment motion. The expert witness for the government provided evidence that the art plates were valueless and the arrangement explained to the investor was similarly without value. The evidence proffered by the expert is directed to the critical issue of value of the original plates and the enterprise of investing in acquisition of original plates. The expert concluded in his report that there is "no value to the enterprise outlined in the agreements. Similarly, no value can be estimated for the 'masters' or 'master-plates' since such estimates—as they relate to enterprise—would be speculative. The value of the rights implied by the terms 'masters' or 'master-plates' would be the net income from the sale of the prints produced after the recapture of all expenses other than the price of the rights. Only to the extent that there is income do the rights have value" (R. 349).

Clarifying and amplifying that report, the expert stated, in affidavit form, that "at no point in my report did I consciously wish to convey the impression that I was 'unable' to value the 'master' or 'master-plates' which were the subject of my report ..." (R. 150). The affidavit contains this provocative language:

It is my professional opinion that the term "master plate" is itself misleading and is atypical to the legitimate art printing industry. Notwithstanding this fact, it is my professional conclusion that, without caveat, the "master plates" referred to in the private offering Memorandum and Purchase Agreements of Texanna Art Trading Company for 1982 have no value.... Even if Agreements in this case had conveyed normal rights to reproduce, rights to reproduce the images examined for my report would have little or no value. This is true because there was and continues to be insufficient demand for limited edition prints, posters, greeting cards, murals and tapestries reproduced from images as those involved in this case. This is due primarily to the fact that the quantity of reproductions and ancillary products which must be sold in order to recoup the cost of manufacture, distribution, promotion, advertisement, and sale of these products would far outstrip demand. Therefore, neither the right to exploit those images nor even the so-called "master plates" has any value.

The affidavit and report is the product of Richard Alasko, a senior member of the American Society of Appraisers, Personal Property and Fine Art and president of the Alasko Company of Chicago, Illinois. His unassailed circula vitae demonstrate that he is no dilettante. This is a man whose expertise was not subject to question nor distain. The trial judge did not refuse to accept Mr. Alasko as an expert but merely took issue with the fact that a dispute had been presented by his report.

The government's expert presents genuine factual issues which must be resolved by the fact finder. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Celotex v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Professional Managers v. Fawer, Brian, Hardy and Zatzkis,* 799 F.2d 218, 222 (5th Cir. 1986); *St. Amant v. Benoit,* 806 F.2d 1294, 1296–97 (5th Cir.1987); *Consolidated Metal Products v. American Petroleum Institute,* 846 F.2d 284, 288 (5th Cir.1988). In granting the summary judgment motion the district court committed reversible error. We therefore REVERSE AND REMAND to the district court for further proceedings.