Victor A. DEBETAZ, et al.,
Plaintiffs–Appellants,

v.

CHEVRON U.S.A., INC.,
Defendant–Appellee.

No. 88–3676.

United States Court of Appeals,
Fifth Circuit.

Jan. 9, 1990.

Rehearing Denied Feb. 8, 1990.

Frederick W. Ellis, Don R. Beard, Strain, Dennis, Ellis, Mayhall & Bates, Baton Rouge, La., Ralph B. Chustz, Kearney, Smith, Chustz & Minogue, New Roads, La., for plaintiffs-appellants.

John C. Christian, Milling, Benson, Woodward, Hillyer, Pierson & Miller, New Orleans, La., for defendant-appellee.

Before THORNBERRY, GARWOOD, and DUHÉ, Circuit Judges.

DUHÉ, Circuit Judge.

This is an action arising out of two oil, gas, and mineral leases. The case was tried without a jury and the district judge denied all relief. We affirm.

Chevron is the lessee of four oil, gas, and mineral leases covering adjacent tracts in the Morganza Field in Pointe Coupee Parish, Louisiana. The plaintiffs/appellants are the successors to the lessors of the two leases at issue ("the Debetaz/Neal leases"). All four leases permit Chevron to pool the leased acreage with adjacent tracts at any time, so long as the pooled acreage does not exceed 160 acres. The leases also provide that if:

a larger spacing pattern or larger drilling or production unit (including a field or pool unit) shall have been fixed and established by an order of a regulatory body of the State of Louisiana or of the United States, ... the unit or units shall be the same as fixed by said order.

Prior to July 1980 Amoco Production Company completed the Hess No. 1 well, in the Morganza Field two to three miles from the property covered by the four Chevron

leases. In August Amoco applied to the Louisiana Commissioner of Conservation for the creation of nine 640–acre units in the vicinity of the Hess well. In September Chevron applied for a permit to drill the Debetaz, et al. No. 1 Well, to be located roughly three miles to the east of the Hess well. The proposed Debetaz well was not located on either of the two Debetaz/Neal leases and the primary terms of those leases would expire on November 20 and 30 respectively. Shortly before the end of the primary terms Chevron asked the Commissioner to add three 640–acre units to the east of the proposed Amoco units. Chevron intended the proposed Debetaz well to be located in one of the proposed additional units. Chevron sought to expedite this application in view of the approaching lease expirations, but later withdrew its unit application when it became unclear whether the Commissioner would act before the leases expired. On October 20 the Commissioner issued Order No. 1102, creating nine 640–acre units in the vicinity of the Hess well. None of the units geographically includes or lies contiguous to the land covered by the Debetaz/Neal leases. The closest unit boundary is roughly a mile from the land covered by the four Chevron leases.

On October 27 Chevron received a permit to drill the Debetaz No. 1 Well. On November 5 Chevron filed a declaration of pooling pursuant to the pooling clauses in the Debetaz/Neal leases. The declaration created a rectangular 160–acre unit around the Debetaz well which unit included small portions of both Debetaz/Neal leases.[1] Chevron commenced operations before the primary terms of those leases expired.

In subsequent years the Commissioner issued orders creating additional 640–acre units in the Morganza field. Each of those orders bore the "1102" prefix. One of these subsequent units included most of the land covered by Chevron's 160–acre declared unit.

The appellants sued Chevron alleging the declaration of pooling was invalid and con-sequently the leases expired at the end of their primary terms. They also alleged Chevron did not conduct itself in good faith and as a prudent operator. The district judge found that Chevron had properly commenced operations for the drilling of the Debetaz well and that the well was located in a validly declared unit. He concluded that in creating the unit and commencing operations Chevron acted as a prudent operator in good faith and that operations at the Debetaz well maintained the Debetaz/Neal leases beyond their primary terms.

### Standard of Review

■ The interpretation of the pooling clause and the determination whether that clause is ambiguous are questions of law reviewable *de novo* on appeal. *City of Austin v. Decker Coal Co.*, 701 F.2d 420, 425 (5th Cir.), *cert. denied*, 464 U.S. 938, 104 S.Ct. 348, 78 L.Ed.2d 314 (1983). Certain crucial findings of fact, however, must be reviewed for clear error under Fed.R. Civ.P. 52(a). These include the findings that the Commissioner had not established a unit covering the subject land as well as a series of findings regarding Chevron's good faith.

### Pooling Clause

The appellants argue that Chevron's declaration of pooling was invalid under the provision of the pooling clause requiring a declared unit to conform to a unit "established by an order of a regulatory body of the State of Louisiana" and that the leases therefore expired at the end of their primary terms. According to the appellants Order 1102 imposed a 640–acre unit size and a spacing pattern for the entire Morganza Field, and not only for the acreage encompassed by the nine originally ordered units. They provide several grounds to support this construction.

They first argue that under Order 1102 and a 1957 Statewide Order[2] units created by the Commissioner have effect beyond

---

1. *See* Appendix.

2. Statewide Order No. 29–E, Louisiana Department of Conservation (July 15, 1957).

their geographic boundaries. Under the Statewide Order if a well is drilled outside of a unit pattern created for a pool and the well might develop an extension of the pool, the Commissioner may require the well to conform to orders affecting that pool. Under Order 1102 any future wells drilled to the 17,900' Tuscaloosa Sand, Reservoir A, even if located outside of the units created under the Order, must be located no closer than certain delineated distances from the unit line and other wells. On the basis of these orders the appellants assert that the district judge erred in concluding that Order 1102 did not apply beyond the nine units it created.

To support the argument that Chevron's declared unit was required to be 640 acres the appellants argue as follows: Under Louisiana law the Commissioner must establish drilling units for each pool, a drilling unit being equivalent to "the maximum area which may be efficiently and economically drained by one well." La.Rev.Stat. Ann. § 30:9 B (West 1989). Order 1102 expressly found that a single well would efficiently and economically drain 640 acres in the Morganza Field, and the propriety of the finding is confirmed by the fact that the subsequent 1102 orders created 640-acre units. Chevron's well permit acknowledged that the Debetaz well was subject to Statewide Order 29–E and the "1102 Series," and the permit expressly designated the applicable field as "Morganza." Documents pertaining to the Debetaz well generally made reference to the "Morganza Field" and it was apparent at the time Chevron declared the 160–acre pool that the Amoco and Chevron wells were in the same geologic formation. Accordingly, in view of the fact that the Commissioner prescribed a certain unit size for pools in the Morganza Field and that the proposed Debetaz well would clearly be located in that field, "an order of a regulatory body of the State of Louisiana" had set a spac-

ing pattern and larger drilling unit within the meaning of the pooling clause. Chevron was therefore required under the pooling clause to declare a 640–acre unit.

■ The unambiguous language of the pooling clause does not support the appellants' argument. The provision at issue does not state that a Commissioner's unit order will be binding if it affects the same "field" or "reservoir" in which the declared unit is located. For purposes of the provision at issue there is no legal significance to the fact that the Amoco units and the Chevron unit are located in the same field or overlay the same reservoir. The pooling provision simply requires a declared unit to be no smaller than a Commissioner's unit covering the same land. Under Louisiana law, "When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." La.Civ.Code Ann. art. 2046.[3]

The appellants' argument unnecessarily clouds the meaning of the pooling clause by making the geographic extent of a Commissioner's unit order dependent on geologic data rather than public records: if a lessee declared a 640–acre unit, it would do so at the peril of being haled into court for having declared a unit larger than 160 acres. If a lessee declared a 160–acre unit, it would do so at the peril of being haled into court for having done so in contravention of a Commissioner's unit order. In either event, the lessor's claim or the lessee's defense would require scrutiny of geologic data in order to determine whether the declared unit and the Commissioner's unit are so situated that the declared unit should be governed by the Commissioner's findings. With the data before it the court's real concern would not be whether the lessee had acted in conformity with principles of conservation and efficient production. The court would simply determine whether the lessee, in declaring

---

**3.** The record contains further evidence that no order of any regulatory body required a unit larger than 160 acres around the Debetaz well. A former petroleum engineer for the Louisiana Department of Conservation testified that he knew of no such order covering the 160–acre tract. In addition, an attorney who specialized in oil and gas matters testified that he made a search of the records of the Louisiana Commissioner of Conservation and discovered no order creating any unit or spacing pattern covering the 160–acre tract.

the unit, had made the right guess. This is an awkward and unlikely construction of the pooling clause and removes all certainty from the act of declaring a unit under the pooling clause.

### Bad Faith

■ The appellants argue that in declaring the 160–acre unit Chevron did not perform in good faith or as a reasonably prudent operator. The district judge found that within the east/west boundary limitations the unit was drawn with the well as centrally located as possible, that Chevron believed the unit would avoid the necessity of drilling wasteful and uneconomical wells on each of the four leases, and that a sound geological basis for the unit existed at the time of the pooling declaration. The judge noted that Chevron had admitted it wished to declare the unit in order to maintain expiring leases, but since Chevron had presented evidence to support a geological justification for the declaration it had acted as a prudent operator in good faith.

The Louisiana Mineral Code requires the mineral lessee to "perform the contract in good faith and to develop and operate the property leased as a reasonably prudent operator for the mutual benefit of himself and his lessor." La.Min.Code Ann. § 31:122 (West 1989).

[I]n exercising the broad powers granted to a mineral lessee by a lease, the mineral lessee is under the duty to exercise them in accordance with the fundamental purpose for which they were granted to him by the lessor-landowner, which is to secure the greatest possible ultimate return to the landowner from the mineral development of his land. The mineral lessee must therefore act in connection with the voluntary pooling power with the good faith intention of serving the lessor-landowner's interest or, at the very least, the mineral lessee must not act in connection with such pooling power to the detriment of the lessor-landowner's interest, since in pooling the lessor-landowner's land, the lessee is acting virtually as the former's agent as well as for itself.

*McDonald v. Grande Corp.*, 148 So.2d 441, 449 (La.App.3d Cir.1962), *writ ref'd*, 244 La. 128, 150 So.2d 588 (1963), *aff'd after remand*, 214 So.2d 795 (La.App.3d Cir. 1968).

The district court's finding that Chevron acted as a prudent lessee in good faith in declaring the 160–acre unit is not clearly erroneous. R.B. Branson was a petroleum geologist employed by Chevron. He testified that, in his opinion, the Debetaz well would drain the entire 160–acre unit. He believed that it was more prudent to drill within the unit than simply drill on the Victor A. Debetaz lease, since without a unit the well would simply drain the other leased properties after the leases on those properties expired. Chevron might have drilled a well on each of the four leases, but Branson believed the drilling of unnecessary wells was not in the interest of conservation.

George Jones was a survey engineer for Chevron and supervised the preparation of the unit plat. He was instructed to prepare a 160–acre rectangular unit centered around the Debetaz well. The unit could not extend beyond land leased to Chevron, and the eastern boundary was therefore placed along the eastern boundary of the Victor A. Debetaz lease. Jones was also instructed to place the western boundary of the unit near the western boundary of the Doucet tract, which lay north of the Victor A. Debetaz and Victor E. Debetaz tracts. In order to meet these requirements and produce a rectangular unit, a small 4.16 acre portion of the Victor E. Debetaz tract was included in the unit. Drawing the unit boundaries to avoid including the Victor E. Debetaz tract, according to Jones, would not have yielded a rectangular unit. Given the limitations on the placement of the rectangle, Jones believed that the plat represented the best rectangle that a surveyor could produce.

The record therefore supports the finding that Chevron acted as a prudent operator in good faith. There is little doubt that Chevron was motivated in part by the desire to maintain expiring leases, but under the present record that motivation alone

does not require a finding of bad faith. The leases permitted Chevron to pool leased acreage at any time before the leases expired and Chevron presented sufficient evidence that the unit was declared for the mutual benefit of both lessee and lessor as required by the Mineral Code. Upon this record as a whole, we are not left with the definite and firm conviction that a mistake has been committed. The district court's findings are not, therefore, clearly erroneous. *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948).

The judgment is AFFIRMED.

## APPENDIX

EXHIBIT "A"

CHEVRON U.S.A. INC.

VU A. V. A. DEBETAZ ET AL No. I

MORGANZA FIELD

POINTE COUPEE PARISH, LOUISIANA