**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Allen F. CAMPBELL and A.F. Campbell
& Co., Inc., Defendants–Appellants.**

No. 88–1872.

United States Court of Appeals,
Fifth Circuit.

March 27, 1990.

Rex E. Lee, Washington, D.C., John A. Price, Winstead, McGuire, Sechrest & Minick, Dallas, Tex., for defendants-appellants.

Kenneth L. Greene, Gary R. Allen, Chief, Richard Farber, Appellate Section, Tax Div., Dept. of Justice, Washington, D.C., for plaintiff-appellee.

Before GARZA, REAVLEY, and POLITZ, Circuit Judges.

POLITZ, Circuit Judge:

Allen F. Campbell and A.F. Campbell & Co., Inc. (hereinafter sometimes "Campbell") appeal a permanent injunction entered pursuant to section 7408 of the Internal Revenue Code,[1] contending that the conduct complained of did not fall within the reach of section 6700 of the Code and, further, that the injunction is overly broad. Subject to the construction given and modification made, we affirm.

### Background

Allen F. Campbell is an attorney with a master's degree in business administration. He is the sole shareholder in both A.F. Campbell & Co., Inc., a Texas corporation, and Inpro Holding Company B.V., a Dutch company. In 1982 he incorporated Coral Sociedade Brasileira de Pesquisas e Desenvolvemento Limitada (Coral) in Brazil where he had lived for several years. Inpro owns all of the shares in Coral.

Coral's stated purpose was to produce monoclonal antibodies (MABs). MABs are laboratory copies of antibodies found in humans and certain animals. When linked to enzymes the resultant MAB conjugates can be used to detect disease-causing organisms. Between 1982 and 1985 Coral entered into 202 contracts to produce a

---

1. Unless otherwise indicated, references to the Internal Revenue Code are to the Internal Revenue Code of 1954 as amended and in effect during the taxable years in issue. The Code was redesignated the Internal Revenue Code of 1986 by Section 2 of the Tax Reform Act of 1986, Pub.L. No. 99–514, 100 Stat. 2085, 2095.

specified MAB conjugate for diagnostic use. These contracts were executed with United States clients. The projects produced only negligible royalties; only five MAB conjugates showed commercial promise.

The Coral interests were marketed as tax shelters. The key to the plan was the Brazilian cruzeiro and its expected continual downward plunge. Coral contracts sold for the cruzeiro equivalent of $600,000 U.S., with a one-eighth cash downpayment of $75,000 and a promissory note for the cruzeiro equivalent of the remaining $525,000. The note was payable in four installments commencing seven years after execution, providing that any royalties from the project were to be used as prepayments.[2] Interest was set at 10 percent. Of critical importance, the note contained no mechanism for monetary correction as the cruzeiro markedly changed in value.

The Brazilian cruzeiro was a rapidly depreciating currency in 1982. According to data furnished as part of the Coral offering materials, $1 U.S. could be exchanged for 4.950 cruzeiros in 1970. By June 1982 the exchange rate had risen to $1 U.S. for 173 cruzeiros. Appellants' expert witness acknowledged a very significant decline in the value of the cruzeiro in 1982 and in 1983.[3] Campbell expected this dramatic decline to continue and so advised investors. Because of this precipitous devaluation, and the lack of a monetary correction factor in the promissory notes, investors could expect to pay only a small fraction of the $525,000 notes. In December 1982 Price Waterhouse advised Coral that the then-value of the notes was an estimated $18,000. In a letter brought to Campbell's attention, the associate dean of the University of Miami Law School, an expert on the Brazilian financial system, opined that the

notes were essentially worthless because of the absence of a monetary correction factor. Nonetheless, accrual basis investors were advised that they could deduct the entire $600,000 in the first year of the transaction in an opinion letter prepared by Campbell and his tax attorney,[4] and disseminated by Campbell. Campbell touted Coral to investors as an 8 to 1 deduction, a $600,000 deduction for a $75,000 cash outlay.

### Analysis

On review, issues of law receive *de novo* scrutiny but the findings of fact are accepted unless shown to be clearly erroneous. Fed.R.Civ.P. 52(a); *Debetaz v. Chevron U.S.A.*, 891 F.2d 562 (5th Cir.1990). Our review of the record not producing a definite and firm conviction that a mistake has been made, we affirm the district court's factual findings.[5] We also agree with the district court's application of the law, although we are compelled to limit the duration of the second paragraph of the injunction to five years.

Congress added section 6700 and 7408 to the Code as part of the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA). Section 6700 provides for assessment of a monetary penalty against any person who, in connection with organizing or selling an interest in a plan or arrangement, makes or furnishes:

(A) a statement with respect to the allowability of any deduction or credit, the excludability of any income, or the securing of any tax benefit by reason of holding an interest in the entity or participating in the plan or arrangement which the person knows or has reason to know is false or fraudulent as to any material matter, or

that the research contemplated by the contract must be completed by the end of the year in which the deduction is taken.

2. The prepayments actually made were negligible. Some were made at the suggestion of Campbell's assistant after the Internal Revenue Service began questioning the tax deductions.

3. The depreciation rate doubled in 1982 and doubled again in 1983. By October 1987 the exchange rate was $1 U.S. for 51,900 cruzeiros.

4. Amendments to the Code enacted in 1984 required modification of the opinion to recognize

5. Because we do not address the matter elsewhere, we here emphasize that the district court's finding that Coral research projects lacked scientific merit is limited to the 202 contracts at issue in this case and has no implications with respect to other MAB research.

(B) a gross valuation overstatement as to any material matter. . . .

26 U.S.C. § 6700(a)(2). A gross valuation overstatement is a statement of value that exceeds 200 percent of the amount determined to be the correct valuation and is directly related to the amount of allowable deduction or credit. 26 U.S.C. § 6700(b)(1); S.Rep. No. 494, 97th Cong., 2d Sess. 267 (1982), *reprinted in* 1982 U.S.Code Cong. & Ad.News 781, 1015. Section 7408 authorizes the court, in a civil action brought by the government, to enjoin a person who has engaged in conduct subject to penalty under section 6700 "from engaging in such conduct or in any other activity subject to penalty under section 6700" if injunctive relief is "appropriate" to prevent recurrence. 26 U.S.C. § 7408(b). The district court found violations of both subsections of the statute and further found injunctive relief appropriate to prevent recurrence. 704 F.Supp. 715.

1. False and fraudulent statements.

■ To establish a violation of section 6700(a)(2)(A), the government must prove that a person (1) made or furnished a statement with respect to tax benefits (2) which he or she knew or had reason to know (3) was false or fraudulent (4) as to a material matter. Material matters are those which would have a substantial impact on the decision-making process of a reasonably prudent investor and include matters relevant to the availability of a tax benefit. 1982 U.S.Code Cong. & Ad.News at 1015; *United States v. Buttorff,* 761 F.2d 1056 (5th Cir.1985).

■ At least two types of statements fall within the statutory bar: statements directly addressing the availability of tax benefits and those concerning factual matters that are relevant to the availability of tax benefits. *See e.g., Buttorff; United States v. Petrelli,* 704 F.Supp. 122 (N.D. Ohio 1986); *United States v. Music Masters, Ltd.,* 621 F.Supp. 1046 (W.D.N.C. 1985), *aff'd* 816 F.2d 674 (4th Cir.1987); D. Slaughter, *The Empire Strikes Back,* 3 Va.Tax Rev. 1 (Summer 1983) (Slaughter). Campbell made both types of statements.

■ We begin our analysis with the Brazilian connection, the linchpin of Campbell's plan. Campbell represented Coral as a company with a substantial presence in Brazil, which purportedly hosted the corporate headquarters and co-hosted Coral's research activities with the United Kingdom. This representation was false and Campbell knew it. The administrative function in Brazil essentially consisted of a functionary whose job was merely to receive, countersign, and forward Coral correspondence and documents. As to research, the MABs were produced entirely in the United Kingdom. The laboratories in Brazil tested the MABs against Brazilian specimens but, according to one of Coral's lead English researchers, *never* produced meaningful results. Campbell attempts to paint these inadequacies as innocent implementation problems. We find ample evidence, however, to support the district court's finding that the Brazil operations were a ruse to justify the use of cruzeiro notes—evidence that ranges from the suggestion, "if possible do it in Brazil," to the language barrier that prevented communication between English and Brazilian research personnel, a problem which would have been resolved as or before it arose had the Brazil research function been more than a fiction.

As Campbell testified, notes generally are denominated in the currency of the country in which the provider of services is located. Because the Brazil operations served no economic function in the Coral enterprise, Campbell's selection of Brazilian currency for the notes also lacked an economic function or purpose. "It is a long-settled rule of law that transactions which have no economic purpose or substance other than the creation of income tax losses or credits are to be disregarded for tax purposes." *Merryman v. C.I.R.,* 873 F.2d 879, 881 (5th Cir.1989); *Gregory v. Helvering,* 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935). Thus, Campbell's knowingly false portrayal of Coral as a company with its center of gravity in Brazil was material to the deductibility of the cruzeiro notes. Representations with respect there-

to constituted violations of section 6700(a)(2)(A).

■ Campbell also made and furnished statements that the cruzeiro notes were deductible in the full amount of their contemporaneous exchange rate when he promoted Coral as an 8 to 1 deduction and disseminated his tax attorney's letter opinion. As Campbell knew or had reason to know, the absence of a monetary correction factor did not comport with standard commercial practice in Brazil and rendered the notes virtually worthless. The district court found that Campbell knew or should have known that the cruzeiro notes were not deductible because they were devoid of economic substance.[6] Again, the evidence amply supports this finding.

Campbell, however, contends that this finding does not justify the legal conclusion that he violated section 6700(a)(2)(A). He argues that a statement concerning the availability of tax benefits is only an opinion, and an opinion cannot be false or fraudulent unless it is not believed by its maker. Thus, according to Campbell, the statute requires deliberate deception, at least with respect to statements regarding the availability of tax benefits, a level of *scienter* beyond the district court's finding that Campbell "knew or should have known" that the cruzeiro notes were not deductible. Although this argument does not affect our finding of liability as a consequence of the representations concerning Coral's presence in Brazil, we conclude that we ought address and reject it.

A close look at *American School of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 23 S.Ct. 33, 47 L.Ed. 90 (1902), a case on which Campbell relies, demonstrates the fallacy in this argument. In *McAnnulty*, the Court held that a statute allowing the United States Postmaster to refuse to deliver mail facilitating fraudulent schemes did not apply to materials concerning mind-healing because "[t]here is no exact standard of absolute truth" by which to evaluate the truth or falsity of a belief in the power of the mind to heal the body. 187 U.S. at 104, 23 S.Ct. at 37. In so holding, the Court stated: "Unless the question may be reduced to one of fact, as distinguished from mere opinion, we think these statutes cannot be invoked for the purpose of stopping the delivery of mail matter." 187 U.S. at 106, 23 S.Ct. at 38. Unlike the representations at issue in *McAnnulty*, Congress determined that statements concerning availability of tax benefits could be reduced to questions of fact and thereby adjudged false by enacting section 6700(a)(2)(A) and proscribing such statements.[7]

Had deduction of a similar foreign currency obligation been disallowed before Campbell organized and promoted Coral, Campbell could not argue that his representations of deductibility were not false. Indeed this court and others have applied section 6700(a)(2)(A) to find liability in analogous circumstances. *See Buttorff; United States v. Kaun*, 827 F.2d 1144 (7th Cir.1987); *United States v. White*, 769 F.2d 511 (8th Cir.1985). Thus, the essence of Campbell's defense is not whether the truth or falsity of his representation is knowable but, rather, whether the statute requires actual knowledge that his representation was false.

The text of section 6700(a)(2)(A) encompasses statements concerning availability of tax benefits and proscribes such statements when the maker knows or has reason to know they are false. When Congress enacted the statute, the code already contained the reason to know standard. We interpreted this standard in section 6013(e) to include "what a reasonable person in the [defendant's] ... subjective posi-

---

6. Long-term debt denominated in a rapidly declining currency was held not genuine for tax purposes in *Levin v. Commissioner*, 87 T.C. 698 (1986), *aff'd*, 832 F.2d 403 (7th Cir.1987). The research and development deductions for the Coral program at issue here were disallowed by the Tax Court in *Agro Science Co. v. Commissioner*, T.C. Memo 1989–687.

7. Campbell does not raise a first amendment challenge to Congress' power to make this determination, a challenge that has failed with respect to section 7408 injunctions entered to prevent recurrence of a section 6700 violation. *Buttorff; United States v. Kaun*, 827 F.2d 1144 (7th Cir.1987); *United States v. White*, 769 F.2d 511 (8th Cir.1985).

tion would have discovered." *Sanders v. United States*, 509 F.2d 162, 166 (5th Cir. 1975). It is reasonable to presume that Congress was aware of this construction when it included the reason to know standard in section 6700. The House Conference Report accompanying TEFRA, while clarifying that the standard does not carry a duty of inquiry, indicates that the reason to know standard allows imputation of knowledge so long as it is commensurate with the level of comprehension required by the speaker's role in the transaction. H.Conf.Rep. No. 760, 97th Cong., 2d Sess. 572 (1982), *reprinted in* 1982 U.S.Code Cong. & Ad.News 1190, 1344. Moreover, at least one other circuit has treated the reason to know standard of section 6700 as equivalent to should have known. *Kaun.* Because Allen Campbell was the architect of the Coral plan, we agree with the district court that he knew or should have known that his representations of deductibility were false. We are persuaded that this factual finding is adequate to impose liability under section 6700(a)(2)(A). Campbell made or furnished statements proscribed by the statute in representing that the cruzeiro notes were deductible, as well as in representing that Coral had a substantial presence in Brazil.

2. Gross valuation overstatement.

█ The district court also found that Campbell represented the value of the Coral contracts at $600,000, while their actual value was closer to the cost of producing the MABs—$5,000 to $15,000. It thereby concluded that Campbell and Campbell & Co. had violated section 6700(a)(2)(B). We agree.

Campbell contends that he never made a representation of value. Although he set a $600,000 price for the Coral contracts, he argues that a quotation of price is not a representation of value. Indeed, an internal Coral memorandum to salesmen admonished "Coral has not made or furnished and does not make or furnish any statement as to the value of its services." Even if statements of price are deemed representations of value, Campbell further argues that they do not trigger section 6700(a)(2)(B)

liability because the research and development tax deductions hinged not on the value of the research contracts but on the value of the cruzeiro note, which Campbell represented as less than $600,000. Thus, Campbell insists, he made no valuation statements directly related to tax deductions. We reject as unpersuasive Campbell's attempted separation of the price of the research contracts, their value, and the tax deductions.

In tax cases, as in other instances, the most frequently used definition of actual or fair market value is "the price at which property would exchange hands in a transaction between a willing buyer and a willing seller, neither being under compulsion to buy nor sell and both being reasonably informed as to all relevant facts." *Music Masters*, 621 F.Supp. at 1055; *see also*, Treasury Reg. 1.170A–1(c)(2). Tax shelters such as the Coral plan eliminate the buyer's incentive to pay no more than the investment's value because the financing mechanism allows the buyer to save more in tax benefits than is paid for the investment. That economic incentive pushes the price above the value. As we recently explained in *Shuman v. United States*, 891 F.2d 557 (5th Cir.1990), section 6700 was enacted to curb the distortions in the tax system that result when the price of an investment reflects overvaluation and thereby yields excessive tax benefits.

Campbell in effect argues that the occurrence of the very distortions that section 6700 was intended to prevent precludes application of the statute. It is only because the purported tax benefits artificially inflated the price which could be obtained for the Coral contracts that Campbell is able to claim that price was not a representation of the contracts' value. And it is only because the artificially inflated price did not reflect the actual value of the contracts that Campbell then can argue that the value of the contracts was not directly related to the tax deductions. We perceive this reasoning as turning section 6700(a)(2)(B) on its head. Were we to accept it we would eviscerate the statute. The district court correctly held that Campbell made

gross valuation overstatements within the reach of section 6700(a)(2)(B).

3. Injunction.

■ Campbell challenges the injunction entered by the district court as punitive, overbroad, and vague. We disagree and, subject to the construction and modification set forth below, affirm.

The first paragraph of the injunction prohibits Campbell from (A) continuing to promote the Coral program in the form at issue in this case, and (B) representing that Coral investors are entitled to tax deductions. It further prohibits defendants from organizing, selling or participating in the sale of any investment which, in order to inflate tax benefits, (C) uses promissory notes lacking economic substance or failing to comport with normal commercial practice, or (D) involves projects lacking in scientific merit or offering completed research. Finally, the first paragraph tracks the language of section 6700 to enjoin Campbell from violations thereof. Campbell asserts that this paragraph is overbroad and vague.

Although subparagraph 1.D of the injunction might be worded more felicitously, the foregoing construction eliminates any ambiguities. Furthermore, we construe the phrase "to inflate tax benefits" as meaning to increase tax benefits above the levels available in the absence of the prohibited investment characteristics. Subject to this construction, we affirm the first paragraph of the injunction.

We reject Campbell's contention that promotion of the Coral program should be prohibited only if accompanied by representations of tax benefits. The use of cruzeiro notes in the context of the Coral program is inherently misleading with respect to tax consequences. Nor do we agree with Campbell that the description of activities prohibited in injunction subparagraphs 1.C and 1.D are impermissibly vague; they are exactly the activities underlying Campbell's section 6700 violation. Finally, we do not find the use of the statutory language vague. Unlike *NLRB v. Express Publish-*

*ing Co.,* 312 U.S. 426, 61 S.Ct. 693, 85 L.Ed. 930 (1941), on which Campbell relies, the court *a quo* found that Campbell had directly violated each of the statutory prohibitions of which it enjoined future violation. Moreover, the Senate Report accompanying TEFRA explicitly authorizes injunction of "particular conduct or ... all conduct violative of new section 6700." 1982 U.S.Code Cong. & Ad.News at 1017.

■ The second paragraph of the injunction requires Campbell to notify the IRS of the intent to participate in the organization or sale of any tax shelter, to provide to the IRS offering materials and to wait 30 days thereafter before beginning promotion and sale. It further requires Campbell to prominently disclose the existence and nature of the final judgment in this case in any promotional materials used to sell another tax shelter. Campbell maintains that this mandatory portion of the injunction exceeds the measures needed to prevent recurrence and thus is punitive. We disagree, noting that at least two other courts have imposed similar injunctions for infractions of section 6700 that are factually closer to the Coral scheme than are the section 6700 violations where affirmative obligations were not imposed. *Compare Music Masters* and *United States v. Philatelic Leasing,* 83 Civ. 4432 (S.D.N.Y.1985) (unpublished),[8] *aff'd,* 794 F.2d 781 (2d Cir. 1986), with *Buttorff* and *United States v. White,* 583 F.Supp. 1118 (D.Minn.1984), *aff'd,* 769 F.2d 511 (8th Cir.1985).

On the one hand, the affirmative obligations imposed on Campbell by paragraph 2 of the injunction do not require the expenditure of resources, a factor which makes courts wary of mandatory injunctions. *Developments in the Law—Injunctions,* 78 Harv.L.Rev. 994, 1063 (1965). On the other hand, the record amply evidences the need for imposition of these affirmative obligations in order to prevent recurrence of section 6700 violations. Among the problems that sections 6700 and 7408 were intended to address was the ability of promoters to design myriad novel tax shelters.

**8.** The opinion underlying the injunction is reported at 601 F.Supp. 1554.

# 1324

As soon as a particular technique was invalidated a new one arose. *Slaughter* at 6–8. The ingenuity of the Coral scheme and Campbell's clear and sustained intent to sidestep the tax laws indicate that the prophylactic measures contained in paragraph 2 of the injunction are very likely necessary to prevent the design and marketing of a new abusive tax shelter.

In affirming the substance of paragraph 2 we hold, however, that the obligations therein imposed should be limited to five years' duration from the date of entry of the injunction. *Music Masters; Philatelic Leasing.* A permanent injunction against future violations of a statute is permitted because such merely requires the enjoined party to obey the law. *Dunlop v. Davis,* 524 F.2d 1278 (5th Cir.1975). We are reluctant, however, to impose affirmative obligations in perpetuity because of the burden imposed on both the defendants and the court. We are persuaded that five years of active oversight by the IRS and the court ought to provide Campbell with sufficient incentive to rectify his operation.

Subject to the above modification and construction of the injunction, the judgment of the district court is AFFIRMED.