T.C. Memo. 2020-59

UNITED STATES TAX COURT

BRUCE W. LEMAY, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 19356-15L.                    Filed May 14, 2020.

Bruce W. Lemay, pro se.

<u>Rachael J. Zepeda</u>, <u>Derek S. Pratt</u>, <u>Alicia E. Elliott</u>, and <u>Trisha S. Farrow</u>,

for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

NEGA, <u>Judge</u>:  This case is before the Court on a petition for review of a

Notice of Determination Concerning Collection Action(s) Under Section(s) 6320

**[*2]** and/or 6330 (notice of determination).[1]  After concessions by the parties,[2] the

primary issue for decision is whether petitioner is liable for penalties totaling

$46,984, $74,694, and $59,398 under section 6700 for tax years 2008, 2009, and

2010, respectively (years at issue).

FINDINGS OF FACT

Some of the facts are stipulated and are so found.  The stipulation of facts

and the attached exhibits are incorporated herein by this reference.  Petitioner,

Bruce W. Lemay, resided in Kansas when the petition was filed.  This case was

consolidated for trial along with the case of Davison v. Commissioner, docket No.

14765-15L.  Our opinion in Davison may be found at T.C. Memo. 2020-58.

I.    Background

Petitioner graduated from Boston College in 1973, where he earned a

bachelor's degree in English.  From 1981 to 1996 petitioner was a corporate

executive in the insurance industry, primarily working in the fields of property and

---

[1]Unless otherwise indicated, all section references are to the Internal
Revenue Code in effect for the years at issue.  All monetary amounts are rounded
to the nearest dollar.

[2]Respondent and petitioner proceeded as if the question of petitioner's
underlying liability is appropriately before this Court, with the primary issue for
decision being whether petitioner is liable for promoter penalties under sec. 6700.
Since both parties proceeded as though the underlying liability is in dispute, we
will follow their lead.

[*3] liability insurance. Petitioner first made the acquaintance of Allen Davison in a professional setting. They became friends, and have maintained that friendship since the early nineties.

It was while working in the insurance industry that petitioner first came to learn of "tool plans".[3] A former colleague had requested petitioner's assistance in calculating, or otherwise determining, how an employer's participation in a tool plan affected that employer's worker's compensation insurance premiums. Petitioner responded that he was unfamiliar with tool plans, but he researched this issue and found that an employer's participation in a tool plan had no effect on the calculation of an employer's worker's compensation premiums. Petitioner reported these findings to his former colleague.

While researching tool plans petitioner discovered a tool plan company called ProCheck and began to foster a relationship with its president. Petitioner and ProCheck's president discussed tool plans generally, as well as their tax aspects. The president of ProCheck offered petitioner the opportunity to join ProCheck. Petitioner sought the advice of Mr. Davison, as petitioner held reservations about ProCheck's operations and the purported benefits its tool plans

---

[3]"Tool plans" generally attempt to operate to recharacterize a portion of an employee's wages as reimbursement or rental expenses reflecting the cost of the employee's tools.

[*4] offered. After being apprised of the details of ProCheck, Mr. Davison validated petitioner's concerns, and advised him to decline ProCheck's offer. Although petitioner declined the offer to join ProCheck, petitioner and the president of ProCheck agreed to form a new company that would promote tool plans, so long as such plans were reviewed and approved by Mr. Davison and his employer, Grant Thornton.

II.    Organization of CMS

On September 29, 1999, petitioner, along with the president of ProCheck and two other individuals affiliated with ProCheck, organized Cash Management Systems (CMS), an S corporation, in the State of Virginia. Petitioner at all relevant times sat on that company's board of directors. From 1999 through the summer of 2002 petitioner served as the president of CMS. After 2002 petitioner served as executive vice president of CMS.

Shortly after organization, CMS formally engaged Mr. Davison, and through him Grant Thornton, to consult with and advise CMS with respect to the tax benefits of its proposed tool plans. Mr. Davison managed the CMS client account for Grant Thornton. Mr. Davison's first task was to review the proposed tool plans' compliance with law.

[*5] III.        Development of the Tool Program

CMS had three different tool plans in its Tool Program:  (1) the existing tool plan, (2) the new tool plan, and (3) the tool use plan.  CMS planned to operate the tool plans in sequence in order to maximize the lifetime tax savings for both the employees and employers enrolled in its plans.  In addition to the tool plans and payroll administration, CMS would offer legal research and free audit representation as part of an overall employee benefits package.  The tool plans, administrative support, and audit representation collectively constituted the Tool Program.

CMS designed its tool plans to allow both employers and employees to claim substantial tax savings by bifurcating an employee's base pay into a taxable labor portion and a nontaxable portion for tool reimbursement or use.  This bifurcation was based upon a proprietary formula.[4]  The CMS Tool Program purported to offer tax savings by limiting Federal income tax withholding, employment taxes, or both, depending on the tool plan.[5]  The maximum tool

---

[4]Despite the fact that CMS marketed its proprietary formula as a selling point of the tool program, petitioner was unaware of how the formula was determined at all relevant times.

[5]We use the term "employment taxes" to refer to taxes under the Federal Insurance Contributions Act (FICA) and the Federal Unemployment Tax Act.  See

(continued...)

[*6] reimbursement or use pay per pay period was 35% of the participating employees wages. CMS made money from fees charged for administering the tool plans. Upon enrolling both an employer and its employees, CMS administered the enrolled employer's payroll and issued associated statements to participating employees. Through those associated statements, CMS kept employers and client-employees abreast of the claimed tax savings from CMS tool plans.

A.    The Existing Tool Plan

Under the existing tool plan, an employer recharacterized a portion of each employee's base pay as a reimbursement to that employee for the cost of tools acquired by that employee before enrolling in the plan. The employees were reimbursed in amounts reflecting the acquisition costs of their tools, rather than the replacement costs or fair market value costs, before enrollment in the existing tool plan.[6] CMS calculated the appropriate tax withholdings for each employer's labor pay, but not tool pay, and remitted this information to the employer. The

_____

[5](...continued)
Weber v. Commissioner, 138 T.C. 348, 357 (2012); Stevens Techs., Inc. v. Commissioner, T.C. Memo. 2014-13, at *27-*29; Otto's E-Z Clean Enters., Inc. v. Commissioner, T.C. Memo. 2008-54, slip op. at 2 n.2.

[6]CMS determined the cost of an employee's tool inventory by reference to an estimate of what the employee had originally paid for those tools rather than the current replacement costs.

**[\*7]** employer withheld the necessary taxes for the labor pay portion, but no taxes would be withheld for the tool portions determined by CMS. CMS claimed that the existing tool plan was an accountable plan under section 62, whereby reimbursement paid to employees for the cost of their own tools used on a job was not considered wages for employment tax purposes.

### B. The New Tool Plan

The new tool plan also recharacterized a portion of each employee's base pay as a nontaxable reimbursement. The only meaningful difference between the existing tool plan and the new tool plan was that, under the new tool plan, employees were reimbursed only for tools purchased after their enrollment. Otherwise, the bifurcation of an employee's base pay operated in an identical manner. The new tool plan also purported to be an accountable plan under section 62.

### C. The Tool Use Plan

Once an employee was treated as reimbursed for the cost of his or her tool inventory by way of the existing and/or new tool plan, CMS transitioned the client-employee to the tool use plan. CMS offered the tool use plan as a method to allow an employee to charge his or her employer a fee for the rental of his or her tools used during the daily course of his or her labor. Similarly to the other plans,

[*8] the employee's base wages were recharacterized into a taxable portion for labor and a tax-exempt portion for rental fees. CMS did not claim the tool use plan was an accountable plan, thus rental fees paid under the plan were subject to Federal income taxation. CMS did claim, however, that the rental fees paid pursuant to the tool use plan fell outside the employment tax definition of wages and thereby reduced the employment tax liability of the employer and the employee. The tool use plan was available to any employee enrolled in the CMS Tool Program, including those treated as fully reimbursed for the stated value of their tools under the existing or new tool plan, or any employee who was treated as having fully depreciated the cost of his or her tools before enrollment in the plan. CMS calculated the tool usage amount for each participating employee and reported the amount to his or her employer so that the employee could be paid accordingly. CMS issued a Form 1099-MISC, Miscellaneous Income, to each client-employee for tool pay received under the use plan. All payments to those employees came from their employer directly, and they would also receive a Form W-2, Wage and Tax Statement, from their employer reflecting their labor pay.

IV. Initial Review of the Tool Plans

Mr. Davison agreed to review the tool plans and their proposed administration. Mr. Davison advised that securing a private letter ruling from the

**[*9]** Internal Revenue Service (IRS) was critical to ensure the viability of the tool plans. In order to better understand the prospects of securing a favorable private letter ruling, petitioner and Mr. Davison sought the advice and counsel of Tom Ochsenschlager, a partner at Grant Thornton's national tax office in Washington, D.C. Petitioner and Mr. Davison provided Mr. Ochsenschlager with relevant information on CMS and the tool plans it intended to offer.

Through a series of communications occurring in November 1999, Mr. Ochsenschlager informed petitioner and Mr. Davison that there was little chance of securing a favorable private letter ruling from the IRS with respect to the CMS tool plans. Mr. Ochsenschlager spoke with attorneys from the IRS and advised petitioner and Mr. Davison that the IRS believed that the tool plans failed to comply with the law applicable to accountable plans. Mr. Ochsenschlager stated that the tool plans allowed for reimbursements to employees in amounts exceeding their out-of-pocket expenses, contravening the statutory requirements for accountable plans. Further, Mr. Ochsenschlager indicated that the IRS believed the tool use plan lacked economic substance, that there was limited legal authority supporting tool reimbursement plans generally, and that the IRS had an interest in litigating against taxpayers promoting tool reimbursement plans such as those proposed by CMS.

[*10] Petitioner and Mr. Davison subsequently met to determine how best to bring the CMS Tool Program to market in the light of Mr. Ochsenschlager's concerns. To that end, on December 2, 1999, petitioner and Mr. Davison met and developed the following plan of action: (1) CMS would aggressively proceed in marketing its three separate tool plans; (2) Mr. Davison would draw up a document on behalf of Grant Thornton endorsing the Tool Program (Grant Thornton's justification paper); (3) Mr. Davison, along with petitioner, would be included in marketing the tool plans to targeted clients; (4) Mr. Davison would train Mike East, an employee of petitioner's wholly owned S corporation, Xell Enterprises, Inc. (Xell), on the tax aspects of the Tool Program, and Mr. East would then train CMS' sales agents on the tax aspects of the Tool Program; and (5) training dates for sales agents, dates for commencing sales calls, and the establishment of sales targets would be set.

During that meeting petitioner and Mr. Davison agreed that the new tool plan and the existing tool plan would be promoted as accountable plans but that the tool use plan was not an accountable plan and payments made thereunder would instead be properly characterized as incidental rental payments. Petitioner and Mr. Davison also agreed that Grant Thornton's justification paper should serve to clearly establish that the only risk of enrolling in the new tool plan and the

**[*11]** tool use plan was payment of additional tax and that neither plan carried the risk of penalties or prosecution. Mr. Davison was aware that the existing tool plan was aggressive and bore the risk of penalties, and this awareness led him to omit the existing tool plan from Grant Thornton's justification paper. Nevertheless, petitioner and Mr. Davison resolved to aggressively market the existing tool plan.

In a letter dated December 6, 1999, petitioner wrote to an associate at Grant Thornton who assisted Mr. Davison with CMS matters generally. In that letter, for purposes of memorializing his meeting with Mr. Davison, petitioner offered specific instructions about what information he wanted included in Grant Thornton's justification paper. Petitioner requested that Grant Thornton's justification paper address the tax regulations and cases that demonstrated the validity and compliance of the new tool plan with accountable plan rules. Additionally, petitioner requested that Grant Thornton's justification paper document the tax cases and regulations supporting the position that payments under the tool use plan were not subject to employment taxes. Further, petitioner requested that Grant Thornton refrain from discussing the existing tool plan in its justification paper but suggested that its risks be discussed with prospective clients in person.

[*12] Mr. Davison wrote and finalized Grant Thornton's justification paper dated February 12, 2000, and delivered it to CMS. Grant Thornton's justification paper did not address the existing tool plan but discussed only the new tool plan and the tool use plan. Grant Thornton's justification paper concluded that the new tool plan qualified as an accountable plan and was therefore exempt from employment taxes and that the potential for a penalty imposed under section 6672 was limited. The paper also concluded that payments to employees under the tool use plan would be unlikely to withstand IRS scrutiny for an accountable plan but that there was a "long line of authority" that such payments should be treated as exempt from self-employment tax. The paper further concluded that if the IRS audited returns of an employer enrolled in the tool use plan and payments made thereunder were recharacterized as wages, the consequence would be possible examination, collection, and submission of employment taxes and interest.

Mr. Davison also drafted an executive summary of Grant Thornton's justification paper for distribution to clients and potential clients of CMS. He drafted the executive summary because CMS advised him that its clients likely did not want to read the full opinion but would prefer an abridged version. The executive summary concluded that the "reimbursement plan for the cost of the employee's tools qualifies as an accountable plan under [section] 62(a)(2)(A)."

[*13] That summary also concluded that "there is a long line of authority leading to the conclusion that the usage payments under CMS' plan should be treated as other income not subject to the self-employment tax."

In both Grant Thornton's justification paper and Mr. Davison's executive summary, Mr. Davison emphasized that the legal positions taken on the Tool Program were supported by "substantial authority". Mr. Davison's executive summary did not include a definition of "substantial authority" or discuss the likelihood that the plans would fail under IRS scrutiny. Neither Grant Thornton's justification paper nor the executive summary emphasized that the legal positions taken in connection with the purported tax benefits available under the Tool Program were supported by "substantial authority" as the term was understood by petitioner and Mr. Davison--that the tool plans had a 33.5% chance of withstanding an IRS attack. Further, Mr. Davison's executive summary did not address or express confidence in the lawfulness of the existing tool plan, despite the fact that CMS marketed its three tool plans simultaneously. Grant Thornton's justification paper and Mr. Davison's executive summary were distributed to clients and potential clients of CMS.

Following CMS' receipt of Grant Thornton's justification paper, petitioner determined that the tool plans were ready to market and delivered a presentation to

[*14] the CMS board of directors indicating as much. The CMS board of directors, on which petitioner sat, approved the tool plans, sales strategy, and marketing materials developed by petitioner and Mr. Davison. CMS began marketing and administering the tool plans immediately thereafter.

## V.    Marketing the Tool Plans

### A.    Xell Enterprises, Inc., and Its Relationship With CMS

CMS used third-party agents to market and sell its tool plans, rather than directly executing sales itself. Petitioner organized Xell in the State of Kansas on April 26, 1999. At all relevant times, petitioner was the sole shareholder and president of Xell. Petitioner originally formed Xell for the purpose of operating his own sales-consulting business. After CMS was organized, however, Xell's primary purpose became marketing and selling CMS' tool plans.

From 1999 through 2010 petitioner oversaw the marketing and sales of CMS' tool plans in his capacity as president and owner of Xell. Petitioner's duties for Xell consisted of managing and training sales agents,[7] coordinating and

---

[7]From 1999 to 2009, Xell also hired independent contractors to serve as sales agents to identify potential clients and pitch CMS' tool plans. CMS would pay Xell sales commissions for enrolling clients, and Xell would remit a percentage of those commissions to the independent contractors responsible for procuring the enrollments. Further, independent contractors would continue to earn a portion of the commissions CMS paid to Xell so long as clients they

(continued...)

[*15] participating in Xell's sales pitches, and closing deals with prospective clients. In his capacity as president of CMS, petitioner's duties blended with those performed in his capacity as Xell's sole shareholder and president in that he directed and participated in the marketing and sales of the Tool Program. More specifically, with CMS, petitioner coordinated, developed, and managed the marketing aspects of CMS' tool program. Petitioner continued to direct the marketing aspects of the tool program in his capacity as the owner and president of Xell while also serving as executive vice president of CMS. Throughout CMS' existence, Xell and petitioner were responsible for procuring all but a few of CMS' clients.

CMS described Xell as its "National Distribution Organization" in its marketing materials. CMS' marketing materials also indicated that Xell's officers were representative of CMS' leadership and integral to the strength of its operations. Xell and CMS shared a web-domain from 2003 to 2011, and petitioner was directly involved in the decision to combine the web-domains. CMS had knowledge of all meetings Xell's sales agents and petitioner had with prospective clients. With Xell, petitioner incurred substantial expenses marketing

---

[7](...continued)
enrolled continued to generate revenue for CMS by remaining in the Tool Program.

[*16] CMS' Tool Program and CMS often reimbursed petitioner for such expenses. When petitioner's role at CMS changed from president to executive vice president, CMS' board of directors passed a resolution declaring that CMS would grant petitioner additional CMS stock if Xell achieved certain sales milestones, thereby tying his incentive compensation at CMS to his performance with Xell.

Xell's primary source of income was sales commissions paid by CMS. In 2009, 99% of Xell's income came from CMS commissions and 97% of the commissions paid by CMS during that year were paid to Xell. For 2010, 96% of all commissions paid by CMS were paid to Xell, and 96% of Xell's income was from CMS commissions.

### B.     The Sales Pitch

Because the tool plans aimed to provide tax savings to employers and employees, CMS needed both parties to enroll in the Tool Program. The first step in the CMS strategy was to enroll employers whose employees were required to furnish their own tools. In general this meant marketing to employers in the heating, ventilation, and air conditioning industry, as well as the automotive and trucking industries. Once CMS successfully enrolled an employer (client-

[*17] employer), the next step was to enroll that employer's employees (client-employees).

### 1. Employers

The sales process would typically begin when sales agents, who were trained and managed by petitioner, identified a potential client-employer. Once a potential client-employer was identified, petitioner or a sales agent would meet with the client-employer and deliver a presentation on the Tool Program. During the presentation, petitioner and the sales agents relied on the marketing strategy and materials that petitioner developed alongside Mr. Davison. CMS relied on the legal positions Mr. Davison expressed in Grant Thornton's justification paper to develop its marketing materials.

CMS' marketing materials included a slide show and informational flyers that provided an overview of the purported tax savings of CMS' three plans. As a general matter, these materials emphasized the Tool Program's compliance with relevant laws.[8] The materials specifically claimed that Grant Thornton's support of the program virtually eliminated any tax liability or risk of penalties, that CMS

---

[8]At a presentation to a potential client in 2008, petitioner advertised that CMS' "unequaled experience has resulted in the successful examination of our program." At the time this statement was made, the IRS had not completed an audit of any of CMS' clients' returns.

[*18] maintained full compliance with IRS guidelines, and that CMS reimbursement plans met the accountable plan requirements under section 62. These materials broadly described the tool plans as a "no net cost" employee benefit that funded an increase in employee take-home pay, while also boosting an employer's bottom line. The marketing materials failed to clarify to potential clients how petitioner's positions on the purported tax benefits available under the Tool Program were supported by "substantial authority" and what exactly that term meant.

Petitioner routinely provided potential clients with additional marketing materials to assuage concerns regarding the legality of the purported tax benefits available under the Tool Program. Such materials included Grant Thornton's justification paper. Other materials included, such as the executive summaries and "comparisons" drafted by Mr. Davison, further represented that Grant Thornton had determined that the new tool plan and the tool use plan complied with applicable law, and that the tax benefits purported to flow therefrom were supported by substantial authority.

The materials petitioner provided to potential clients represented that the CMS tool plans and proprietary formulas had been "tested and accepted", undergone "successful examination", and found to comply with all "tax

[*19] requirements". Further, these materials emphasized that Grant Thornton would represent CMS' clients during audit at no cost. If prospective or current clients had questions, Mr. Davison was available to speak with them. Mr. Davison did in fact speak with prospective clients on the tax aspects of the Tool Program, and these conversations often resulted in client enrollment.

### 2. Employees

Although an employee's participation in the tool plan was voluntary, the employee's attendance at a CMS or Xell sales presentation was mandatory. Petitioner pressured client-employers to maximize employee participation in enrollment on the grounds that it would foster a better employee and employer relationship and promote greater savings for the employer. When the Tool Program was met with concern or skepticism by employees, petitioner often recommended a one-on-one meeting with them to explain "why their fear is not accurate." During such meetings, petitioner or a sales agent aimed to provide the concerned employee with a "more accurate insight" into the program and its benefits.

The marketing materials directed toward the prospective client-employees also emphasized that the tool plans offered an increase in an employee's take-home pay. The decision to enroll in the full suite of tool plans was presented as

[*20] simple as the decision to pick up a $20 bill on the ground. These marketing materials, however, did not disclose the level of risk involved with participating in a CMS plan. Petitioner instructed client-employees who received conflicting advice from an independent tax adviser regarding the Tool Program's legal compliance to contact CMS in order to resolve any discrepancies.

C.  Postenrollment Procedure

After enrolling, a client-employer executed an account agreement and authorization to debit with CMS to pay CMS fees for its administration of the Tool Program. CMS would then coordinate with the client-employer to establish a timeline for enrolling employees and implementing the tool program thereafter. Once a timeline was set, CMS would turn its attention to marketing the Tool Program to the employees.

Although employees could enroll in one or more of the three tool plans, approximately 90% of all client-employees enrolled in all three. If a client-employee enrolled in all three tool plans, the first step was the completion of an enrollment form for submission to CMS. The enrollment form included a chart organized by different categories of tools with corresponding spaces for the client-employee to fill in the acquisition costs of all the tools he or she owned at the time of enrollment. Client-employees were encouraged to include as many tools as

**[*21]** possible in determining the total acquisition costs of their tools, even if some of those tools were not required for their employment with the client-employer.

CMS explicitly instructed client-employees not to state the replacement costs or the fair market values of their tools on the enrollment form. If employees did not have records of the acquisition costs of their tools, they were instructed to estimate the original costs and write those amounts on the enrollment form. The enrollment forms instructed client-employees to enter these estimated costs under a space for "miscellaneous" tools, without listing each separate tool or its cost. The enrollment forms also instructed client-employees to answer a yes or no question as to whether they had depreciated or expensed any of their tools, and, if so, how much in total. Until 2007 client-employees were not formally required to provide receipts supporting the acquisition costs stated on the enrollment forms or to list the dates they purchased their tools. In 2007 CMS asked prospective clients and current clients to provide receipts along with their tool inventories; however, CMS did not enforce this requirement. The marketing materials emphasized the importance of accurate record substantiation in accordance with the accountable plan rules. However, no one from CMS or Xell was responsible for verifying that the stated acquisition costs for an employee's tools were, in fact, accurate.

[*22] The sum total of the client-employee's acquisition costs for the tool inventory was tracked as the employee's base for reimbursement for the duration of his or her enrollment in the existing tool plan. Under the existing tool plan CMS characterized a fixed percentage of each client-employee's gross wages in each pay period as a partial reimbursement for the value of his or her tool inventory and paid that amount each pay period until the client-employee was fully reimbursed for the tool inventory. CMS' practice of encouraging client-employees to list as many tools as possible had the effect of greatly inflating the employees' bases for reimbursement and therefore increased both the purported tax savings and the fees received by CMS.

CMS operated the new tool plan in a manner similar to the existing tool plan. Under the new tool plan, when a client-employee purchased a new tool, he or she would report the purchase and cost to CMS, and that tool and its value would be added to the client-employee's tool inventory and treated as reimbursed in the same manner as the preexisting tool inventory.

Once a client-employee was reimbursed for the cost of his or her tool inventory, CMS would transition the client-employee to the tool use plan. Under that plan CMS categorized a portion of the client-employee's base pay as tool

**[*23]** rental fees, in a proportion determined by applying a CMS-developed formula against the total value of the client-employee's tool inventory.

VI.    Professional Advice Regarding the Tool Program and Marketing Materials

A.    Crowe Chizek

After Mr. Ochsenschlager of Grant Thornton's national office concluded that there was little to no chance of securing a favorable IRS private letter ruling with respect to the Tool Program, petitioner and Mr. Davison actively sought a second opinion. Petitioner contacted to the accounting firm Crowe Chizek (Crowe) to inquire about CMS' prospects of securing a favorable private letter ruling. Petitioner provided Crowe with a copy of Grant Thornton's justification paper for Crowe's evaluation.

On October 9, 2000, Robert Zwiers of Crowe wrote a letter (Crowe opinion) to petitioner with Crowe's analysis of Grant Thornton's justification paper. Grant Thornton's justification paper did not include an analysis of the existing tool plan. Accordingly, the Crowe opinion did not discuss the existing tool plan. The Crowe opinion stated that Grant Thornton's justification paper provided insufficient information for Crowe to determine whether the new tool plan met the requirements for an accountable plan. The Crowe opinion also stated that the IRS had recently withdrawn a private letter ruling where it has concluded that

[*24] payments made under an accountable plan were not subject to Federal employment taxes. The Crowe opinion stated that it was possible that the conclusion reached in that private letter ruling could apply to the new tool plan. As to the tool use plan the Crowe opinion stated that "there does not appear to be any authority for * * * [Mr. Davison and petitioner's] conclusion" that payments made thereunder were not subject to Federal employment taxes. Further, the Crowe opinion stated that there was no support for treating payments to employees, in their capacity as employees, as exempt from Federal employment taxes unless made under an accountable plan. The Crowe opinion concluded there appeared to be little support, if any, for the position that payments under the tool use plan should be exempt from Federal employment taxes.

Petitioner did not accept the advice in the Crowe opinion. Rather, he asked Mr. Davison to draft a response to the Crowe opinion on behalf of Grant Thornton in which he disputed that advice. In a letter dated November 1, 2000, Mr. Davison responded to the Crowe opinion and sent the response to petitioner. Mr. Davison's letter concluded that the Crowe opinion incorrectly stated that there was insufficient information to determine whether the requirements of an accountable plan were met in the New Tool Plan. Mr. Davison also concluded that, although there was not any caselaw specifically addressing usage payments under a plan

[*25] similar to the Tool Use Plan, the use plan was in compliance with all relevant law. Petitioner and Mr. Davison's support of the Tool Program was unaffected by the Crowe opinion. CMS made no changes to the Tool Program after receiving the Crowe opinion.

B. McDermott Will & Emery

Petitioner also contacted the law firm of McDermott, Will & Emery (McDermott) regarding the Tool Program. In addition to the new tool plan and the tool use plan, petitioner sought McDermott's opinion on the existing tool plan, which was not addressed in Grant Thornton's justification paper. McDermott sent petitioner a memorandum dated June 1, 2001, written by tax attorneys David Fuller and Janine Cook.

In that memorandum, McDermott stated that tool reimbursement plans were the subject of increased scrutiny because the IRS had placed employer reimbursement programs on its Priority Guidance Plan. McDermott's memorandum warned that the existing tool plan would likely fail the accountable plan requirements. McDermott explained that the IRS would not allow CMS to reimburse client-employees for expenses incurred before the employees' current employment. McDermott advised that the new tool plan was "the strongest component of the * * * [Tool Program] under the accountable plan rules," but also

[*26] noted that aspects of that plan needed to be modified in order to comply with accountable plan rules. Specifically, the new tool plan would likely run afoul of the business connection component of the accountable plan rules if CMS operated a plan in which a client-employer paid the same weekly amount whether or not the employee incurred business expenses.

McDermott confirmed Mr. Davison's conclusion that the tool use plan would probably fail the accountable plan requirements. McDermott concluded if the tool use plan failed the accountable plan rules, there was no support for the position that payments made under the tool use plan were exempt from Federal employment taxes. McDermott also warned petitioner that operating the three tool plans in tandem greatly increased the risk of losing in an IRS audit. This is because "an independent party bargaining at arm's length would not agree to both pay for buying the * * * [employee's tools and equipment] and then pay for using the * * * [tools and equipment], unless the latter payment was only intended to cover maintenance and related continuing costs."

McDermott offered a number of recommendations for bringing the Tool Program into legal compliance. McDermott recommendations included, but were not limited to, the following: (1) that CMS offer only the combined Tool Plans where expense reimbursements would be for the value of the use of tools and

[*27] equipment attributable to ongoing maintenance, insurance and inventorying costs; (2) that CMS enforce a salary reduction if the employee failed to incur or substantiate tool expenses for any given payroll period; (3) that, for the existing tool plan, CMS ensure all eligible expenses were incurred within a year; (4) that expenses had not been incurred in the capacity of independent contractor and had not been previously reimbursed, deducted, or depreciated; and (5) that expenses have been incurred for tools that will be used to perform services for the employer.

After petitioner received McDermott's memorandum, petitioner and Mr. Davison scheduled a meeting with the McDermott attorneys who had drafted it. Before that meeting petitioner sent Mr. Davison an email asking how CMS ought to modify the existing tool plan in the light of the fact that McDermott's memorandum cited a private letter ruling in which the IRS had disallowed reimbursement of the acquisition costs of tools purchased before an employee's tenure with his or her current employer. Despite petitioner's knowledge that McDermott recommended changes be made to the existing tool plan to bring it into compliance, CMS made no changes to the Tool Program as a result of McDermott's memorandum.

**[\*28]** C.     <u>Grant Thornton's Disavowal of CMS and the Tool Program</u>

On April 15, 2001, Mr. Davison gave Grant Thornton his resignation letter, effective October 15, 2001.  Mr. Davison left Grant Thornton to pursue another full-time job with the National Association of Independent Truckers, which offered him a more flexible work schedule.  Mr. Davison continued to work with and on behalf of CMS after leaving Grant Thornton.

In a letter received by petitioner dated June 26, 2002, Grant Thornton demanded that CMS stop using Grant Thornton's name in marketing the Tool Program.  The letter was written by Robert P. Scales, associate general counsel for Grant Thornton.  In that letter Mr. Scales also advised that CMS did not have permission to distribute copies of correspondence and memoranda from Grant Thornton for purposes of marketing the Tool Program.  Further, Mr. Scales insisted that CMS clarify with its existing and potential clients that Grant Thornton did not endorse the Tool Program.

Petitioner responded to Grant Thornton with a letter dated July 22, 2002.  Petitioner wrote the letter in order to salvage the relationship between Grant Thornton and CMS.  In petitioner's letter he defended CMS' use of Grant Thornton's name in its marketing materials on the ground that the positions CMS had taken regarding the new tool plan and the tool use plan were made with the

**[*29]** knowledge and agreement of Mr. Davison and Mr. Ochsenschlager.[9]

Petitioner requested that Grant Thornton provide updated feedback on the tool

plans, or alternatives to bring CMS' positions current.

Grant Thornton responded to petitioner in a letter dated August 15, 2002,

reiterating that no position or alternative argument could be made to support the

tool use plan. Grant Thornton clarified that a reimbursement plan is either

accountable and thereby exempt from employment taxes or nonaccountable and

subject to both income and employment taxes. Grant Thornton again advised that

CMS stop marketing the tool use plan as a general matter and demanded that CMS

stop using marketing materials with Grant Thornton's name on them. Further,

Grant Thornton advised that Rev. Rul. 2002-35, 2002-1 C.B. 1067, effectively

---

[9]Mr. Ochsenschlager repudiated petitioner's assertion that the positions CMS had taken regarding the tool program were made with his knowledge and agreement. Mr. Ochsenschlager recalled that his "conclusion was negative" with respect to the new tool plan and the tool use plan. Mr. Ochsenschlager commented that, on both occasions when he had met with Mr. Davison and petitioner to discuss the Tool Program, he expressed no optimism that the tool use plan would pass muster with the IRS. Mr. Ochsenschlager stated that the new tool plan could probably be supported if it essentially expensed small tool purchases, but he regarded the tool use plan as the "bread and butter of CMS."

[*30] rendered moot Mr. Davison's argument that a tool reimbursement plan may be nonaccountable and nonetheless avoid employment taxes.[10]

Following receipt of Grant Thornton's letter dated August 15, 2002, petitioner understood that CMS no longer had the support of Grant Thornton. Despite petitioner's knowledge that clients enrolled in the Tool Program under the assumption that it was supported by Grant Thornton, CMS failed to notify any of its client-employers or client-employees that Grant Thornton no longer supported the Tool Program. Although CMS' relationship with Grant Thornton terminated in 2002, some clients that enrolled before that time continued to believe that Grant Thornton was responsible for their audit defense until as late as 2011.

D.    Mr. Davison's Response to Grant Thornton's Disavowal

In response to Grant Thornton's disavowal of its relationship with CMS, petitioner requested that Mr. Davison draft a series of memoranda in support of the Tool Program. First, Mr. Davison drafted a memorandum dated July 24, 2002,

---

[10]Rev. Rul. 2002-35, 2002-1 C.B. 1067, dealt with pipeline welders and equipment mechanics. The mechanics were employees who also provided equipment to the employer, and they received a separate payment for use of the equipment. The ruling held that the payments were subject to both income and employment taxes. The ruling also stated in pertinent part that "[i]f an arrangement does not satisfy one or more of * * * [the accountable plan] requirements," all of the amounts paid under the arrangement would be paid under a nonaccountable plan. Id., 2002-1 C.B. at 1068.

**[*31]** concluding that a number of tax theories supported the conclusion that the existing tool plan met the business connection requirement of the accountable plan rules. Mr. Davison also stated that client-employees ought to be allowed deductions for the costs of any existing tools used on the job and that such expenses constituted ordinary and necessary business expenses. Mr. Davison reasoned that employees entered into a new business with respect to their existing tool inventory by enrolling in the CMS Tool Program and that this conversion opened the doorway to ordinary and necessary business deductions with respect to the costs of those tools. Mr. Davison understood that client-employees might have purchased their tools several years before participating in the existing tool plan. Further, Mr. Davison understood that client-employees did not hold themselves out as being in a new or different trade or business by virtue of their enrollment in the CMS Tool Program.

Mr. Davison's memorandum dated July 24, 2002, did not address whether tools unnecessary for a job, or tools used outside of work, were eligible for reimbursement under the accountable plan rules. Mr. Davison knew that an employee's expense incurred for an unnecessary tool "murkies the water" as to whether it qualifies as an ordinary and necessary business expense. Petitioner

**[*32]** promoted Mr. Davison's memorandum dated July 24, 2002, in selling the Tool Program.

Mr. Davison also drafted a memorandum dated October 10, 2002, which did not discuss the existing tool plan. This memorandum concluded that "substantial authority" supported the new tool plan's qualification as an accountable plan. Mr. Davison's opinion defined "substantial authority" as a 33.5% chance of prevailing if returns were examined by the IRS. This memorandum also concluded that payments made under the tool use plan were not subject to self-employment or payroll taxes, but it did not directly conclude that substantial authority existed for this position. Mr. Davison reasoned that since the client-employee was not in the trade or business of renting tools or equipment, rental payments made under the use plan were not subject to self-employment tax.

Mr. Davison created an executive summary of his memorandum dated October 10, 2002, on November 22, 2002. Mr. Davison was asked to draft this executive summary for marketing purposes, and CMS did in fact use it for marketing purposes.

In the executive summary dated November 22, 2002, the existing tool plan is mentioned only once. Mr. Davison wrote: "[A] variation of * * * [the new tool] plan may allow employees to substantiate the cost of their existing tools when they

[*33] initially enroll in the plan to take advantage of tax benefits of reimbursement for existing tools without income tax or employment taxes." Further, Mr. Davison asserted that both the new tool plan and the tool use plan were supported by "substantial authority", and that in the event of an audit, CMS would provide audit support at no cost. In direct contrast with Grant Thornton's reading of Rev. Rul. 2002-35, supra, Mr. Davison did not believe that the ruling dictated that reimbursement plans must qualify as accountable plans in order for payments made thereunder to avoid employment taxes.[11] Petitioner used this executive summary to help sell the tool plan and to train CMS and Xell sales agents in marketing the Tool Program.

E.    KPMG's Opinion on the Tool Program

Following Grant Thornton's disavowal of the Tool Program, petitioner sought to bolster the reputation of CMS and the Tool Program by obtaining support from another independent tax firm. Petitioner also wanted another

---

[11]Mr. Davison concluded that the technical underpinnings of the CMS tool usage program plan were not addressed by Rev. Rul. 2002-35, supra. He then concluded that the IRS tacitly acknowledged that payments for use of property might constitute rent. He grounded these conclusions on his reading of a 2001 field service advice, FSA 200127004, which he read to allow for usage payments separate from the employment relationship that are not considered wages for employment tax purposes, regardless of whether such payments were made under an accountable plan.

[*34] opinion on the likelihood of obtaining a favorable IRS private letter ruling. To that end, petitioner contacted KPMG's Wichita office (KPMG) and requested its opinion of Mr. Davison's memorandum dated October 10, 2002. On April 3, 2003, CMS received KPMG's opinion on the Tool Program. There was no discussion of the existing tool plan in KPMG's opinion.

KPMG advised petitioner that the tool use plan failed the accountable plan rules and advised that Rev. Rul. 2002-35, supra, did not permit alternate characterizations of payments made to employees. Accordingly, KPMG advised that payments made to employees be characterized as wages for services rendered, accountable plan reimbursements, or nonaccountable plan reimbursements. Further, KPMG stated that nonaccountable plan payments were treated as additional wages, and employee payments not made under an accountable plan were subject to income taxation and employment taxation. KPMG noted that there was no direct or indirect support for bifurcating wages plan as contemplated under the tool use plan.

KPMG concluded that the new tool plan appeared to meet the requirements of an accountable plan but noted that each employer should be encouraged to adopt formal, written personnel policies providing conditions for reimbursement consistent with the accountable plan requirements. The record does not reflect

[*35] CMS' having encouraged its clients to do this. Further, no changes were made to the Tool Program in the light of KPMG's opinion and CMS did not distribute it to clients.

     F.     <u>Further Opinions by Mr. Davison and Second Try With McDermott</u>

In 2005 petitioner requested that Mr. Davison write another opinion for CMS, as well as an executive summary of that opinion, in the light of Rev. Rul. 2005-52, 2005-2 C.B. 423. That ruling concluded that tool allowances paid to employees were not paid under an accountable plan because the substantiation and return of excess requirements were not met. Further, the ruling concluded that all tool allowance payments under the arrangement must be included in the employees' gross income and reported on the employees' Forms W-2 and are subject to withholding and payment of Federal employment taxes. <u>Id.</u>, 2005-2, C.B. at 425. Mr. Davison drafted the requested opinion dated September 14, 2005, and a related executive summary. This opinion, like earlier opinions written by Mr. Davison, did not address the existing tool plan or the valuation formula provided by CMS. Petitioner used this opinion to help sell the CMS tool plans.

The September 14, 2005, opinion and its executive summary stated that there was "substantial authority" to conclude that reimbursement for tools acquired after enrollment, i.e., the new tool plan, would be nontaxable. As with

**[*36]** prior opinions written by Mr. Davison, "substantial authority" meant a 33.5% chance that the plan would survive IRS scrutiny. With respect to the tool use plan, Mr. Davison again concluded that payments made to technicians for the use of their tools were not subject to self-employment or payroll taxes. Mr. Davison rejected KPMG's position that Rev. Rul. 2002-35, supra, precluded nontaxable status for usage payments made under a plan that failed to comply with the accountable plan rules, and he instead asserted that Rev. Rul. 2002-35, supra, opened alternative characterizations such as that promoted under CMS' use plan.

Mr. Davison's opinion and executive summary explained that, under Rev. Rul. 2005-52, supra, "employers using accountable plans to reimburse employees for the cost of providing tools must substantiate the expenses reimbursed and, to the extent the plan provides payments before expenses are incurred, the plan must require that the employee return amounts in excess of the substantiated expenses." Mr. Davison understood this to mean that "the ruling clarifies that an accountable plan may not use estimates to substantiate the amount of the expenses." This negated the viability of CMS' existing tool plan; however, Mr. Davison's memorandum and executive summary did not address this concern. Mr. Davison's executive summary did not address the risks of using the three tool plans in conjunction. Further, in the executive summary Mr. Davison reiterated the

**[*37]** conclusions and rationale used in prior opinions, despite new rulings and legal advice that invalidated these positions.

Petitioner once again sought to obtain a favorable independent opinion regarding the tool plans' legal compliance law, and he contacted McDermott. On December 16, 2005, CMS received another opinion from McDermott, which warned CMS as follows:

> We believe you should anticipate an audit of a client in which the IRS will challenge the nontaxable "accountable plan" treatment of the reimbursements for both current and new inventory, subjecting all such payments to income and FICA taxes on the basis that the reimbursements are amounts that would be paid anyway (i.e., as a usage payment), thus violating the accountable plan regulations. The IRS is unlikely to respect the reimbursement arrangement nor to recognize the usage payment as separate from the compensation for services, subjecting the usage payment to FICA taxes as well.

The McDermott opinion advised that Rev. Rul. 2005-52, supra, "makes it even harder for prospective CMS clients to rely upon the positions being asserted by CMS." McDermott explained that the revenue ruling required tool allowance payments to be included in gross income and reported as wages subject to withholding and employment taxes if the arrangement did not require substantiation and return of excess payments, as required under the accountable plan rules. McDermott noted that CMS' reimbursement program appeared "almost indistinguishable" from the program discussed in the revenue ruling

[*38] notwithstanding CMS' proprietary calculations. Petitioner did not distribute this opinion to clients or potential clients. Petitioner and CMS made no changes to the tool program as a result of this opinion.

Mr. Davison wrote another opinion in support of the Tool Program dated July 1, 2007. Petitioner did not use this opinion primarily for the purpose of selling the Tool Program, because CMS and Xell were not selling the Tool Program at that point. Nevertheless, the opinion was distributed to existing clients, and Mr. Davison wrote it with the understanding that it would be used to market the Tool Program. Mr. Davison addressed the existing tool plan in his July 1, 2007, opinion. He concluded that "substantial authority" supported the position that reimbursements for tools acquired before and after the initiation of CMS' tool reimbursement plan were nontaxable under the accountable plan rules.

Around October 2007 CMS made its first substantive change to the tool program. At that time, CMS began to require receipts for purposes of substantiating payments made under the reimbursement plans. Although this was a change to the Tool Program that appeared to be required in the light of Rev. Rul. 2005-52, supra, and was advised by McDermott in its 2005 memorandum, CMS waited over two years to make this change. CMS did not discontinue the existing tool plan for those already enrolled and made no other substantive changes to the

**[*39]** Tool Program. Therefore, those already enrolled in the existing tool plan did not have to provide receipts.

Mr. Davison wrote one more memorandum to CMS dated November 28, 2007, in response to a Chief Counsel Advice (CCA) in which the IRS announced increased audit attention would be paid to tool reimbursement plans, such as those administered by CMS. Mr. Davison described the recent CCA as follows:

> This CCA raises some serious concerns regarding the CMS existing tool plan * * * I am concerned that CMS clients need to acknowledge and understand a "substantial authority" conclusion only avoids tax penalties; not actual tax and interest. At this point, I am not ready to recommend a Draconian approach of suspending the existing tool plan and seeking a legislative remedy, but it should be in the back of our collective minds.

Mr. Davison knew that CMS did not attempt to verify client-employees' statements regarding the costs, business use, depreciation, and prior reimbursements for their tools. He recommended that CMS start requiring client-employees to reimburse their employers for excess reimbursements. Mr. Davison acknowledged that the existing tool plan was the "Achilles heel" of the Tool Program and that no matter what CMS did to change the existing tool plan, it might not be enough to bring it into compliance. Despite repeated advice to the contrary, Mr. Davison stated his confidence that the tool use plan would pass IRS

[*40] muster and complied with the relevant rules and regulations. As to the new tool plan, Mr. Davison stated it should easily pass IRS muster.

On August 22, 2008, petitioner emailed Mr. Davison and the other CMS board members indicating that a client of CMS had notified petitioner that the IRS issued a coordinated paper dated July 2, 2008, in which it concluded that the tool and equipment plans it had seen to date failed to meet the accountable plan requirements. Petitioner subsequently forwarded to Mr. Davison and other CMS board members an article published in the August 22, 2008, issue of Payroll Currently entitled "Tool Plan Payments Must Be Included in Employees' Gross Income, IRS Says", which discussed the IRS coordinated paper referenced in the email dated August 22, 2008. That article ultimately concluded that "the routine reimbursement of unsubstantiated expenses and the practice of recharacterizing wages as reimbursements until the employee's tool inventory value is zeroed out, only to reinstate the original wage amount at that point, 'evidence a pattern of abuse of the accountable plan rules.'"

VII. Client Audits, Injunction, and Penalties

A. Client Audits and Injunctions Against CMS, Petitioner, and Davison

Several CMS clients' returns were audited by the IRS in connection with their participation in the CMS Tool Program beginning in 2008. In total 24 CMS

**[*41]** client-employers had returns audited by the IRS. Petitioner received calls from many of these clients regarding audit representation, and petitioner provided these clients with a protest letter drafted by Mr. Davison defending the CMS tool plans. Each of CMS' clients whose returns were audited was required to remit additional employment taxes. The total resulting tax due was $4,591,106.

In February 2008 the United States initiated an action against Mr. Davison to enjoin him from promoting tax shelters. Petitioner was aware of the suit when it was initiated. CMS took no action against Mr. Davison on the basis of the injunction action. Petitioner continued to distribute protest letters prepared by Mr. Davison to CMS clients with returns under audit. Petitioner failed to notify CMS clients that Mr. Davison was being sued for the promotion of tax shelters.

On May 11, 2010, the U.S. District Court for the Western District of Missouri found that Mr. Davison had "routinely falsely and fraudulently advised clients that his tax arrangements were legal." The District Court concluded that Mr. Davison's "record establishes that this cycle will continue unless he is barred from providing tax advice without significant restraint." Therefore, the District Court enjoined Mr. Davison from organizing, establishing, promoting, selling, or offering for sale or helping to organize, establish, promote, sell, or offer for sale

[*42] any tax plan.  As a result of the injunction, Mr. Davison's C.P.A. licenses were suspended in 2011.

The District Court required Mr. Davison to provide a copy of its order within 60 days to each client for whom petitioner had provided any type of tax-related advice within the last five years.  Mr. Davison did not provide a copy of the injunction to any of CMS' client-employers or client-employees.  Mr. Davison did notify CMS and petitioner of the injunction.  Nevertheless, CMS continued to distribute protest letters prepared by Mr. Davison to CMS clients with return under audit.  Petitioner did not notify CMS clients that Mr. Davison was sued for the promotion of tax shelters.  On December 17, 2010, Mr. Davison was officially suspended indefinitely from representing anyone in front of the IRS; however, CMS continued to distribute an unsigned version of Mr. Davison's protest letter to its clients.

B.    Section 6700 Penalty Examination

In 2008 the IRS opened a section 6700 penalty examination against CMS, petitioner, and Mr. Davison regarding the Tool Program.  The matter was assigned to an IRS revenue agent (RA).  The RA concluded that CMS and its principals, including petitioner, made a number of false or fraudulent statements concerning the Tool Program, that petitioner knew or had a reason to know these statements

[*43] were false or fraudulent, and that these statements had a substantial impact on the decision-making process of the clients and caused them to avoid the payment of employment taxes. Therefore, in accordance with section 6700, the RA determined that the IRS should assess penalties against CMS, petitioner, and Mr. Davison.

To calculate the penalties against petitioner, the RA reviewed CMS' client list. CMS had 91 client-employers for whom it was administering a tool plan during the period between January 1, 2006, and December 31, 2008. Of those 91 clients, only 63 were still participating as of the end of 2008. The RA identified CMS' gross receipts for each tax year at issue. For 2008 CMS earned gross receipts of $587,298.[12] For 2009 CMS earned gross receipts of $933,674. For 2010 CMS earned gross receipts of $742,473. The RA then multiplied these amount by petitioner's ownership of shares in CMS, 16%, for tax years 2008, 2009, and 2010. The RA then multiplied petitioner's proportionate share of the gross receipts by 50% as required by section 6700(a).

The RA prepared and submitted for supervisory approval Forms 8278, Assessment and Abatement of Miscellaneous Civil Penalties, dated January 23,

---

[12]For 2008 the RA included only half the gross receipts in the penalty base to be conservative.

[*44] 2014, for the years at issue. The RA's immediate supervisor signed and dated the Forms 8278 on March 26, 2014. On June 24, 2014, respondent assessed penalties against petitioner pursuant to section 6700 for tax years ending December 31, 2008, 2009, and 2010, of $46,984, $74,694, and $59,398, respectively. On that same day, respondent issued petitioner Notice CP15, Notice of Penalty Charge, for each of the tax years at issue formally communicating to petitioner for the first time respondent's determination of those penalties. On July 15, 2014, petitioner submitted Forms 6118, Claim for Refund of Tax Return Preparer and Promoter Penalties, to respondent for the years at issue.

Petitioner paid $150 toward his penalty liability for each of the years at issue in conjunction with his submission of the Forms 6118.[13] Respondent had not acted on petitioner's Form 6118 by the time the notice of determination was issued on July 2, 2015.

Before respondent concluded the section 6700 penalty examination, petitioner and the U.S. Department of Justice agreed that petitioner would execute a stipulated order for permanent injunction under sections 7402, 7407, and 7408. This stipulated order was signed by petitioner on January 4, 2013, and was filed

---

[13]The Notice CP15 stated consistently with sec. 6703(c)(1) that petitioner could pay not less than 15% of the penalty and file a claim for refund on Form 6118 for the amount paid within 30 days after the date of the Notice CP15.

[*45] on January 14, 2013, with the District Court in which the injunction action was pending. This stipulated order enjoined petitioner from further promoting unlawful tool reimbursement, tool rental, or tool use tax avoidance schemes that could implicate sections 6700 and 6701. The stipulated order also enjoined petitioner from advising customers that the tool reimbursement and tool reimbursement plans, or any other similar plan, are consistent with the internal revenue laws. Petitioner also executed the same stipulated order on behalf of Xell, which was signed by petitioner on January 4, 2013, and filed on January 14, 2013. Petitioner, along with Mr. Davison, executed the same stipulated order on behalf of CMS, which was signed on January 4, 2013, and filed on January 15, 2013.

VIII. CDP Process

On October 27, 2014, respondent sent petitioner a Final Notice of Intent to Levy and Notice of Your Right to a Hearing (levy notice) with respect to petitioner's unpaid section 6700 penalties for the tax years at issue. Petitioner timely submitted a Form 12153, Request for a Collection Due Process or Equivalent Hearing, dated November 20, 2014 (CDP request 1), in response to his receipt of the levy notice. Petitioner submitted a document with his CDP request 1, titled "Explanation of Taxpayer Position", dated November 20, 2014. In this document, petitioner explained that "he ha[d] paid tax and filed Forms 6118

[*46] seeking refunds of the tax paid," and that he "directs * * * [respondent] to suspend all collection activities when * * * [his] claim for a refund in a section 6700 case is pending."

While petitioner's CDP levy hearing was pending, respondent issued a Notice of Federal Tax Lien Filing and Your Right to a Hearing Under Section 6320 (lien notice) dated December 9, 2014, to petitioner for the tax years at issue. Petitioner timely submitted a second Form 12153, dated January 9, 2015 (CDP request 2), in response to the lien notice. Petitioner also submitted a document with CDP request 2, titled "Explanation of Taxpayer Position", dated January 9, 2015. In this document petitioner reiterated that "he ha[d] paid tax and filed Forms 6118 seeking refunds of the tax paid" and that he "directs * * * [respondent] to suspend all collection activities when * * * [his] claim for a refund in a section 6700 case is pending."

Petitioner's CDP request 1 and CDP request 2 were assigned to a settlement officer (SO) with no prior involvement with the liabilities at issue. On February 2, 2015, the SO sent petitioner an appointment letter scheduling a face-to-face CDP hearing for February 19, 2015, requesting that petitioner provide the SO with a completed Form 433-A, Collection Information Statement for Wage Earners and Self-Employed Individuals. At petitioner's request the CDP hearing was

[*47] rescheduled to February 20, 2015.  Petitioner and the SO held a face-to-face CDP hearing on February 20, 2015, at the Kansas City Appeals Office.

The SO sent petitioner a letter dated March, 27, 2015, scheduling a second face-to-face CDP conference for April 10, 2015, and requesting that petitioner provide the SO with a completed Form 433-A.  At petitioner's request, the second CDP hearing was rescheduled to April 13, 2015, and was held on that date at the Kansas City Appeals Office.

During the February 20, 2015, CDP hearing, petitioner told the SO that he "wanted his day in court" regarding the underlying liabilities for the promoter penalties.  The SO explained to petitioner that petitioner's refund claim appeared invalid because petitioner failed to pay 15% of the penalty, but he notified petitioner that he would inquire into the status of the refund.[14]  Petitioner did not raise any collection alternatives or submit any of the financial information requested by the SO.  Petitioner raised no other issues during the February 20, 2015, CDP hearing.  During the April 13, 2015, CDP hearing, petitioner reiterated that the underlying liability was flawed.  Petitioner again stated his desire to dispute the underlying liability for the promoter penalty in court, and that he was

---

[14]The SO had no jurisdiction over the refund claim, but was making this statement as an expression of his opinion on the matter.

[*48] not interested in collection alternatives at that time. At the time of the CDP hearings, respondent had not ruled on petitioner's Form 6118 claim for refund. Further, petitioner had not filed suit in District Court regarding his claims for refund, despite the expiration of the six-month period without a decision on those refund claims by respondent.

On July 2, 2015, the Appeals Office issued a notice of determination sustaining the levy notice and the lien notice. The notice of determination indicated that respondent could not move forward with the collection action while petitioner's claims were under consideration, or during any subsequent litigation related to denial of those claims. The suspension of the levy action does not invalidate the issuance of the levy notice. Further, the filing of the lien notice by respondent is not similarly restricted under section 6703.

On July 30, 2015, petitioner timely filed a petition with this Court.

OPINION

I.     Standard of Review

Sections 6320 and 6330 require the Commissioner to notify a taxpayer if he has filed a lien or intends to levy on that taxpayer's property. The notice must inform the taxpayer of his or her right to a CDP hearing regarding the filing of a lien or the proposed collection action. Secs. 6330(a), 6320(a). In a CDP hearing

[*49] taxpayers may raise any relevant issue or request the consideration of a collection alternative. Sec. 6330(c)(2)(A). Taxpayers may not challenge the underlying tax liability unless they did not receive a statutory notice of deficiency or otherwise have an opportunity to dispute the liability. Sec. 6330(c)(2)(B). Once the Commissioner issues a notice of determination at the conclusion of the CDP hearing, the taxpayer may seek judicial review by timely filing a petition with this Court. Sec. 6330(d).

When the underlying tax liability is properly at issue, we review that determination de novo. Sego v. Commissioner, 114 T.C. 604, 610 (2000). In the instant case, the underlying liabilities are the section 6700 penalties imposed on petitioner for promoting abusive tax shelters. This Court has jurisdiction to review the Commissioner's determination when the underlying tax liabilities stem from section 6700 penalties. Gardner v. Commissioner, 145 T.C. 161, 174 (2015), aff'd, 704 F. App'x 720 (9th Cir. 2017). Section 6700 penalties are not subject to deficiency procedures. Sec. 6703(b). Respondent concedes that petitioner did not have an opportunity to dispute his liabilities for the section 6700 penalties with the Appeals Office before his administrative CDP hearing. Further, the parties proceeded as if petitioner's underlying liabilities were appropriately challenged

**[\*50]** and properly at issue in this case. We follow the lead of the parties and review de novo the question of petitioner's liabilities under section 6700.

II.    Section 6700 Penalty

    A.    Burden of Proof

Section 6700 penalties are subject to the procedural rules of section 6703. Section 6703(a) provides that the Secretary bears the burden of proving a taxpayer's liability with respect to penalties assessed under section 6700. Although this Court has not decided the appropriate standard of proof in determining liability for section 6700 penalties, this Court in Gardner v. Commissioner, 145 T.C. at 175 n.10, cited a Court of Appeals for the Ninth Circuit decision affirming a District Court's application of the preponderance of the evidence standard in a section 6700 case. Additionally, the Court of Appeals for the Tenth Circuit applied the preponderance of the evidence standard in a case for injunctive relief under section 7408 based on a violation of section 6700. United States v. Hartshorn, 751 F.3d 1194, 1198 (10th Cir. 2014). We will follow the Court of Appeals for the Tenth Circuit, the likely appellate venue, and apply a

**[*51]** preponderance of the evidence standard. See Golsen v. Commissioner, 54 T.C. 742, 757 (1970), aff'd, 445 F.2d 985 (10th Cir. 1971).[15]

## B.   Elements and Application

To satisfy the burden of proof with respect to section 6700, respondent must prove by a preponderance of the evidence that petitioner:  (1) organized (or assisted in the organization of) or participated (directly or indirectly) in the sale of an interest in an investment plan or arrangement, or any other plan or arrangement; and (2) made material statements concerning the "tax benefits"[16] to be derived from that plan or arrangement that petitioner knew or had reason to know were false.  See sec. 6700(a).  We address these requirements in turn.

---

[15]This Court has applied a preponderance of the evidence standard with respect to analogous penalty contexts, such as penalties assessed under sec. 6702(a) when taxpayers file frivolous returns.  See O'Brien v. Commissioner, T.C. Memo. 2012-326.  Additionally, a number of Federal courts have specifically held that preponderance of the evidence is the appropriate standard of proof under secs. 6700 and 6701.  See United States v. Estate Pres. Servs., 202 F.3d 1093, 1098 (9th Cir. 2000); Barr v. United States, 67 F.3d 469, 469 (11th Cir. 1995).

[16]For purposes of sec. 6700, "statements concerning the tax benefits" means: "a statement with respect to the allowability of any deduction or credit, the excludability of any income, or the securing of any other tax benefit by reason of holding an interest in the entity or participating in the plan or arrangement".  Sec. 6700(a)(2)(A).

[*52]        1.        <u>Organization and Sale of a Plan or Arrangement</u>

Petitioner contends that he did not sell a plan or arrangement to avoid taxes. Petitioner does not refer to specific evidence in support of this contention but asserts that the record on the whole supports this position.

Section 6700 does not define the terms "investment plan or arrangement" or "any other plan or arrangement." Further, there are no regulations defining what conduct constitutes the organization of an entity, plan, or arrangement described in section 6700(a)(1)(A). Nevertheless, Federal caselaw on this issue instructs that a "plan or arrangement" under section 6700 should be defined broadly and that the "sale of a plan or arrangement" component of section 6700 "is satisfied simply by 'selling an illegal method by which to avoid paying taxes.'" <u>See</u> <u>United States v. Stover</u>, 650 F.3d 1099, 1107 (8th Cir. 2011) (quoting <u>United States v. Benson</u>, 561 F.3d 718, 722 (7th Cir. 2009)). For purposes of section 6700, "any 'plan or arrangement' having some connection to taxes can serve as a 'tax shelter' and will be an 'abusive' tax shelter if the * * * [promoter] makes the requisite false or fraudulent statements concerning the tax benefits of participation." <u>United States v. Raymond</u>, 228 F.3d 804, 811 (7th Cir. 2000). Federal courts have found that engaging in a broad range of marketing activities constitutes participation in the sale of any interest in an entity, plan, or arrangement, for purposes of section 6700.

**[\*53]** See id.; see also United States v. Kaun, 827 F.2d 1144, 1149-1150 (7th Cir. 1987).

We conclude that respondent has demonstrated that the CMS Tool Program is a plan or other arrangement under section 6700 and that petitioner organized and assisted in the sale of that plan or arrangement. To those ends, evidence shows, and we find, that CMS marketed and sold the Tool Program as a multistep benefit plan through which employers and employees could avoid paying taxes and that petitioner was a primary and indispensable figure in the plan's organization and sale. The Tool Program consisted of three different tool plans: (1) the existing tool plan, (2) the new tool plan, and (3) the tool use plan. CMS operated the tool plans in sequence, thereby attempting to maximize the purported lifetime tax savings for enrolled employees and employers. In addition to the tool plans and payroll administration, CMS promised to offer legal research and free audit representation as part of an overall employee benefits package. CMS charged fees for administering the tool plans. All CMS' claims that the Tool Program offered a legal avenue to achieve tax savings were unsupported by law. Further, all of the independent tax professionals with whom petitioner and Mr. Davison consulted rejected the position that the Tool Program provided its enrollees a means to achieve legal tax savings. We find that CMS administered a

[*54] benefits program, the Tool Program, that had as its primary purpose the reduction in Federal income and employment taxes. Therefore, the Tool Program constituted a plan or arrangement under section 6700. See Kaun, 827 F.2d at 1149-1150; see also United States v. Zanfei, No. 04 C 2703, 2006 WL 2861051, at *8 (N.D. Ill. Sept. 29, 2006).

We also find that respondent has shown that petitioner was an organizer and seller of a plan or arrangement under section 6700. CMS existed solely to market and operate the Tool Program. Petitioner was a founding member of CMS and at all relevant times sat on its board of directors. Petitioner served as president of CMS from 1999 to 2002, and as executive vice president of CMS thereafter. Further, at all relevant times, petitioner, in his capacity as sole shareholder and president of Xell, oversaw the marketing and sales of the CMS tool plans. Xell was responsible for securing the majority of CMS' clients and revenues. Petitioner's duties with Xell consisted of managing and training sales agents, coordinating and participating in sales pitches, and closing deals with prospective clients. Petitioner's core duties with CMS and Xell were indistinguishable, and in both capacities he directly participated in the marketing and sales of the CMS Tool Program. Ultimately, petitioner was instrumental in organizing and facilitating the sales of the CMS Tool Program.

**[\*55]**        2.        Petitioner's Material Statements He Knew or Had Reason To Know Were False

As relevant here, the section 6700 penalty applies when the organizer (or assistant thereto), or seller of a subject plan (or assistant thereto), makes or causes to be made any statement with respect to tax benefits arising from participation in such a plan that (a) is material and (b) he or she "knows or has reason to know is false". See sec. 6700(a). Statements covered by section 6700 include factual matters that are relevant to the availability of tax benefits and those directly addressing the availability of tax benefits. See Stover, 650 F.3d at 1108. Unqualified statements concerning the tax benefits of a subject plan have been found to be false or fraudulent statements under section 6700. See United States v. Gleason, 432 F.3d 678, 683-684 (6th Cir. 2005). The question of materiality does not require proof that anyone actually relied on the misrepresentations or lies of the promoter. Gardner v. Commissioner, 145 T.C. at 176. Rather, a statement is material if it would have a substantial impact on the decision-making process of a reasonably prudent investor or concerns matters relevant to the availability of a tax benefit. See United States v. Campbell, 897 F.2d 1317, 1320 (5th Cir. 1990).

The question of whether an alleged promoter's statements were knowingly false, or whether he or she had reason to know the same, requires an evaluation of

[*56] what a reasonable person in his or her position would have discovered. See id. at 1321-1322. To determine whether an alleged promoter knew or had reason to know the statements he or she made were false, Federal courts have considered: (1) the extent to which he or she relied on knowledgeable professionals, (2) his or her sophistication and education, and (3) his or her familiarity with tax matters. United States v. Estate Pres. Servs., 202 F.3d 1093, 1103 (9th Cir. 2000); see Kaun, 827 F.2d at 1149. Further, if an alleged promoter knew his or her statements contradicted settled law or were contrary to express IRS guidance, he or she would be is treated as if he or she had a reason to know that such statements might be and probably were false. See Stover, 650 F.3d at 1110. Additionally, omission of material facts weighs as heavily making false material statements. See id. at 1109-1111; see also Hartshorn, 751 F.3d at 1202 (Court of Appeals for the Tenth Circuit applying section 6700 in the context of an injunction under section 7408 used the reasonable person test).

Petitioner does not specifically dispute that he made material statements regarding the tax benefits of the Tool Program. However, he contends that he did not make any material statements that he knew or had a reason to know were false regarding the tax benefits of the Tool Program. Petitioner argues that he relied on the advice of highly respected tax professionals in organizing and marketing the

[*57] Tool Program. For support, petitioner points out that he relied on Mr. Davison's tax advice in creating and marketing the Tool Program, particularly Grant Thornton's justification paper. Petitioner asserts that the record shows he was transparent with prospective clients regarding the risks incident to the Tool Program, specifically that the tool plans would likely be unsuccessful on an IRS audit.

### a. Material False Statements About the Existing Tool Plan's Compliance With the Accountable Plan Rules

Respondent argues that petitioner made material false statements concerning the tax benefits of the Tool Program. Specifically, respondent contends that petitioner stated falsely that reimbursement payments made under the existing tool plan were nontaxable under the accountable plan rules. Further, respondent contends that such statements would have a substantial impact on a reasonably prudent investor's decision-making process because such statements include matters relevant to the availability of a tax benefit. See Campbell, 897 F.2d at 1320; see also Stover, 650 F.3d at 1111 ("[Stover] promised to reduce his client's taxable income by hundreds of thousands of dollars. Any such promise would have had a substantial impact on the decision making process of a reasonably prudent investor."). We agree with respondent and find that the CMS Tool

**[\*58]** Program's existing tool plan did not qualify as an accountable plan and that statements made by petitioner to the contrary while marketing the tool program were material and false.

Under section 62(a)(2)(A), an employee can deduct certain business expenses incurred in connection with the performance of services for an employer under a reimbursement or other expense allowance arrangement.  If these expenses are reimbursed by the employer pursuant to an "accountable plan", then the reimbursed amount is excluded from gross income and is not considered wages or other compensation.  Sec. 1.62-2(c)(4), Income Tax Regs.  Thus, expenses reimbursed pursuant to an accountable plan would be exempt from withholding and payment of employment taxes.  See id.  However, if the reimbursement is not made under an accountable plan, then the amount of the reimbursement is treated as wages and is included in the employee's taxable income.  Id. subpara. (5)

To qualify as an accountable plan, the plan must:  (1) have a business connection, (2) require substantiation of expenses, and (3) require the return to the employer of amounts exceeding the employee's actual expenses.  Id. paras. (c), (d), (e), and (f).  A reimbursed employee expense can be "in connection with" the performance of services as an employee, and excludable from gross income under the accountable plan rules, only if it is incurred by an employee on behalf of the

[*59] employer that provides the reimbursement. Id. para. (d)(1).

Reimbursements for expenses incurred before an employee's employment with his or her current employer are not incurred by an employee in the course of his or her current employment, and would thus fail the business connection requirement. See Biehl v. Commissioner, 118 T.C. 467, 478 (2002), aff'd, 351 F.3d 982 (9th Cir. 2003).

At all relevant times, the existing tool plan was marketed as an accountable plan. Promotional materials created by petitioner emphasized the existing tool plan's compliance with the laws and regulations on accountable plans. Although an employer's employees had the option of enrolling in one or more of the three Tool Plans, approximately 90% of all client-employees enrolled in the existing tool plan. A client-employee was required to fill out an enrollment form as the first step toward full participation in the existing tool plan. On the enrollment form, the client-employee listed the acquisition cost of all his or her tools, including tools acquired before employment and tools unnecessary for the job. Employees were instructed to, and did in fact, include on their enrollment forms the acquisition costs of tools unrelated to their work or purchased in years before their current employment. This practice is directly inconsistent with the business connection requirement of the accountable plan rules. See sec. 1.62-2(d)(1),

**[\*60]** Income Tax Regs.; see also Biehl v. Commissioner, 351 F.3d at 986-987 (stating that in order to meet the business connection requirement, reimbursed expenses must be incurred during the course of employment).  Therefore, the existing tool plan did not meet the business connection requirement of the accountable plan rules.

Further, to properly substantiate expenses, employees must submit information to the employer sufficient to identify the specific nature of each expense and to conclude that the expense is attributable to the employer's business activities.  Sec. 1.62-2(e)(3), Income Tax Regs.  Each of the elements of an expenditure or use must be substantiated to the payor.  Namyst v. Commissioner, T.C. Memo. 2004-263, slip op. at 4, aff'd, 435 F.3d 910 (8th Cir. 2006); sec. 1.62-2(e)(3), Income Tax Regs.  In accordance with section 1.62-2(e)(3), Income Tax Regs., if an employee is not required to substantiate an expense to the payor for reimbursement, then the reimbursement arrangement is not an accountable plan.  Further, if an employee merely aggregates expenses into broad categories, or reports individual expenses through the use of vague nondescriptive terms (such as "miscellaneous business expenses"), the substantiation requirement is not satisfied.  Id.

**[\*61]** In determining the total acquisition cost of a client-employee's tools, CMS instructed client-employees to list as many tools as possible, even unnecessary or previously acquired tools. If the employee did not have records of the acquisition costs of their tools, the employee was instructed to estimate the original costs and write that amount on the enrollment form. Client-employees were not required to provide either receipts supporting the acquisition costs stated on their enrollment forms or to list the dates they purchased their tools. Although petitioner claimed CMS formally changed this rule in 2007 to require receipts, CMS did not demand receipts from its current or future clients.

Although CMS and Xell's marketing materials emphasized the importance of accurate record substantiation in accordance with the accountable plan rules, no one from CMS or Xell verified that the stated acquisition costs for the tools were accurate or that a given tool was needed for the job. Further, the enrollment form did not require the client-employee to list the cost of each separate tool but instead directed the client-employee to categorize the tool costs into broad categories, such as a "miscellaneous" category. These behaviors are directly inconsistent with the substantiation requirement of the accountable plan rules. See sec. 1.62-2(e)(3), Income Tax Regs.

**[*62]** Because the existing tool plan did not meet the business connection requirement or the substantiation requirement, it is not an accountable plan. False statements under section 6700 include representations that a plan qualifies for special tax treatment when the plan does not comply with the law. See Koresko v. United States, 123 F. Supp. 3d 654, 682-689 (E.D. Pa. 2015). The marketing materials created and used by petitioner and sales agents included statements that the existing tool plan was in compliance with the law on accountable plans. Therefore, petitioner made and caused sales agents of CMS and Xell to make false statements concerning the availability of tax benefits under the Tool Program. Further, because statements concerning whether the existing tool plan qualified as an accountable plan are statements directly relevant to the availability of a tax benefit, such statements are material. See Campbell, 897 F.2d at 1320.[17] Therefore, petitioner made material false statements concerning the availability of tax benefits under the Tool Program with respect to the existing tool plan's qualification as an accountable plan.

---

[17]Respondent has shownThe record establishes that petitioner failed the business connection and substantiation requirements of the accountable plan rules. Consequently, we need not address whether he failed the excess receipts requirement.

**[\*63]**     b.     <u>False Statements About the Tax Benefits of the Tool Use Plan</u>

Promotional materials created and used by petitioner and CMS' sales agents marketed the tool use plan as a method to allow a client-employee to charge his or her employer a nontaxable fee for the rental of the employee's tools during the daily course of the employee's labor. Petitioner and Mr. Davison knew that the tool use plan failed the accountable plan requirements and did not attempt to market the tool use plan as an accountable plan. Instead, CMS claimed that the rental fees paid under the tool use plan fell outside the employment tax definition of wages, and payments made thereunder, from the employer's point of view, were not subject to the employment tax. Marketing materials erroneously claimed that relevant law supported the tool use plan.

Despite claims in CMS' promotional materials that payments made under the tool use plan were nontaxable, petitioner was repeatedly instructed by independent tax professionals that there was no authority for the conclusion that such payments were not subject to Federal employment taxes. Further, petitioner was aware that the IRS in Rev. Rul. 2002-35, <u>supra</u>, instructed that if a plan or arrangement does not satisfy one or more of the accountable plan requirements, all amounts paid under that arrangement are paid under a nonaccountable plan and

[*64] taxed as wages. Petitioner and Mr. Davison were repeatedly made aware of this guidance but persisted in marketing the tool use plan as resulting in nontaxable payments. Petitioner used Mr. Davison's legal opinions in promoting the tool use plan despite the fact that all of the other tax practitioners with whom he consulted completely disagreed with Mr. Davison and advised petitioner to stop marketing the tool use plan as resulting in nontaxable payments.

Ultimately, petitioner's marketing materials claimed the tool use plan was supported by law, but the evidence in the record does not support that claim. Petitioner failed to instruct client-employers and client-employees as to the risks that the tool use plan would fail in an audit by the IRS. Statements are false when assertions are not qualified and customers are not notified that following the advice could subject them to IRS scrutiny. Stover, 650 F.3d at 1109-1110. Petitioner was repeatedly instructed as to the risks associated with enrollment in the tool use plan but failed to inform prospective and current clients of that risk. Therefore, petitioner made false statements as to the tax benefits incident to participation in the tool use plan, and by extension, the Tool Program. See id. Such claims were material because they concerned the availability of tax benefits under the Tool Program. See Campbell, 897 F.2d at 1320.

**[*65]**          c.          Petitioner's False Statements Concerning the Risks of Enrolling in the Tool Program

Statements are false when promoters fail to qualify assertions about the availability of tax benefits and notify clients that following the statements could subject them to IRS scrutiny. See Stover, 650 F.3d at 1109-1110. Courts have repeatedly held that a tax promoter's failure to advise his clients of the requirements to qualify for a tax benefit qualify as a false statement. See Gleason, 432 F.3d at 682-683; Estate Pres. Servs., 202 F.3d at 1101.

Although petitioner and Mr. Davison believed there was a mere 33.5% chance that the new tool plan and tool use plan would succeed in an audit by the IRS, they marketed the Tool Program as if there were minimal risks in enrollment. For example, petitioner did not mention that tool reimbursement plans were being closely scrutinized by the IRS when he discussed the Tool Program with current and prospective clients. Instead, the marketing materials emphasized that the tool plans offered an increase in an employee's take-home pay. Further, the decision to enroll in the full suite of tool plans was presented as simple as the decision to pick up a $20 bill on the ground. Executive summaries drafted by Mr. Davison represented that Grant Thornton had determined that the new tool plan and the tool use plan complied with applicable law and that the tax benefits purported to flow

[*66] therefrom were supported by "substantial authority". The summaries did not disclose that Grant Thornton, KPMG, McDermott, and Crowe rejected the position that there was legal authority supporting the tool use plan and the new tool plan as administered by CMS. These executive summaries also failed to address the lawfulness of the existing tool plan, despite the fact that CMS marketed all three plans simultaneously. Petitioner and Mr. Davison aggressively marketed the existing tool plan despite their common understanding that this plan carried a risk of penalties and was an aggressive tax planning tactic.

Petitioner's failure to emphasize the IRS' heightened scrutiny toward tool reimbursement plans was a failure to inform the clients that following his advice could subject them to IRS scrutiny. See Stover, 650 F.3d at 1109-1110. Further, petitioner did not truthfully disclose the availability of tax benefits under the Tool Program generally, particularly benefits available under the existing tool plan. See id. Together, these omissions constitute the promulgation of additional false statements concerning the tax benefits available under the Tool Program. See id.; Gleason, 432 F.3d at 682-683; see also Estate Pres. Servs., 202 F.3d at 1101. Such statements are material precisely because they concern the availability of tax benefits under the Tool Program. See Campbell, 897 F.2d at 1320.

**[*67]**    d.    <u>Petitioner's Knowledge That His Material Statements About the Tax Benefits of the Tool Program Were False</u>

Petitioner argues that he did not violate section 6700 because he did not know or have reason to know that he made material false statements concerning the tax benefits of the Tool Program. Petitioner contends that he lacks tax and legal expertise. Petitioner argues that he relied on the tax guidance of Mr. Davison.

Respondent contends that petitioner is not entitled to rely on Mr. Davison's advice because Mr. Davison was not an independent tax adviser and was a copromoter and a necessary element of the Tool Program's commercial success. In support of this position, respondent directs our attention to <u>Estate Pres. Servs.</u>, where the Court of Appeals for the Ninth Circuit held that a promoter had not relied on professional advice when he chose to ignore those who were skeptical as to the legality of his statements and to take the advice of only those who unquestioningly agreed to further the scheme. <u>Estate Pres. Servs.</u>, 202 F.3d at 1103. The record indicates that Mr. Davison was not an independent tax adviser, but instead was intimately involved in the development of the CMS Tool Program. Mr. Davison sat on the CMS board of directors and was held out as the tax expert behind the Tool Program. Mr. Davison was specifically assigned the task of

**[*68]** mollifying skeptical client-employees' concerns about the legality of the Tool Program. Petitioner understood that Mr. Davison's "substantial authority" opinions meant the new tool plan and the tool use plan stood only a 33.5% chance of success on audit. Petitioner failed to adequately communicate this to potential client-employers and client-employees. During the IRS audits of CMS' clients' returns, petitioner provided copies of Mr. Davison's protest letter, despite petitioner's knowledge that Mr. Davison was enjoined from promoting tax shelters.

Additionally, petitioner was aware of guidance issued by the IRS indicating increased audit attention to tool reimbursement plans such as those marketed and administered by CMS. Petitioner was repeatedly advised by independent tax practitioners, including Crowe, Grant Thornton, KPMG, and McDermott of the risks that the tool plans would fail to pass muster if returns were examined by the IRS. Crowe, Grant Thornton, KPMG, and McDermott informed petitioner that there was no legal authority for the tool use plan. Instead of relying on the advice of impartial tax professionals, petitioner chose to follow Mr. Davison's advice.

Courts have found that the "know or reason to know standard" means what a reasonable person in the taxpayer's subjective position would have discovered. See Campbell, 897 F.2d at 1321-1322. We look at (1) the extent to which the

[*69] taxpayer relied on knowledgeable professionals, (2) the taxpayer's sophistication and education, and (3) the taxpayer's familiarity with tax matters. Estate Pres. Servs., 202 F.3d at 1103. A taxpayer has reason to know that statements may be and probably are false when those statements contradict settled law or are contrary to express IRS guidance. Stover, 650 F.3d at 1110.

It is clear that petitioner was aware of IRS guidance relevant to the legality of the Tool Program. Further, petitioner was aware that no knowledgeable professional with whom he consulted agreed with Mr. Davison's position regarding the tool program. Instead of relying on these knowledgeable professionals, petitioner completely ignored their advice and made no changes to the tool program as a result of their recommendations. Further, petitioner knew that Mr. Davison believed each of the tool plans would probably fail IRS examination, which results in the denial of the tax benefits under the Tool Program. Thus, petitioner was aware that these programs were not devoid of risk, which was how he presented the plans to potential clients. Petitioner helped design the Tool Program along with Mr. Davison, and regularly discussed the tax advice he received with the firms that issued it, as well as with Mr. Davison. To claim petitioner had no tax knowledge would mean he ingested no tax information during the years spent designing, marketing, discussing the Tool Program--a

[*70] program whose value depends entirely on the purported tax benefit it delivered to the customer. Ultimately, we agree with respondent that petitioner knew or should have known that his material statements regarding the tax benefits available under the tool program were false.

III.     Supervisory Approval and Amount of Penalties

Respondent bears the burden of production with respect to petitioner's liability for section 6700 penalties. See sec. 7491(c). As part of that burden, respondent must show that the written supervisory approval requirement of section 6751(b)(1) was timely complied with. See Graev v. Commissioner, 149 T.C. 485, 493 (2017), supplementing and overruling in part 147 T.C. 460 (2016); see also Clay v. Commissioner, 152 T.C. 223, 249 (2019). On the record before us we find that respondent has met his burden of production. The RA's immediate supervisor personally approved the initial determination of the section 6700 penalties assessed against petitioner on March 26, 2014, by signing the Forms 8278 for each of the years at issue. The penalties assessed were first communicated to petitioner by way of a Notice CP15, dated June 23, 2014, for each of the years at issue. Thus, written supervisory approval for the penalties was given before the first formal communication of the penalties to petitioner. Belair Woods, LLC v.

**[\*71]** <u>Commissioner</u>, 154 T.C. \_\_, \_\_ (slip op. at 23) (Jan. 6, 2020); <u>see also</u> <u>Clay</u>

<u>v. Commissioner</u>, 152 T.C. at 246-250.

Section 6700(a) provides that for any promoter who makes or causes to be

made any material false statements relating to tax benefits, the amount of the

penalty shall be equal to 50% of the gross income the promoter derived therefrom.

Thus, the penalty is appropriately calculated as 50% of the gross income petitioner

derived from selling, or participating in selling, the Tool Program.[18]  Respondent

assessed section 6700 penalties against petitioner in the total amount of $181,076.

In determining the section 6700 penalty for each of the tax years at issue, the RA

identified CMS' gross receipts and then multiplied that amount by 16%,

petitioner's proportionate share of the gross receipts.  The RA then multiplied

petitioner's proportionate share of CMS' gross receipts by 50% for each of the tax

years at issue.

---

[18]Penalties under sec. 6700 are not assessed for discrete taxable years, but for conduct and transactions that occur over one or more taxable years, not on an annual basis.  <u>Planned Invs., Inc. v. United States</u>, 881 F.2d 340, 344 (6th Cir. 1989).  In <u>Gardner v. Commissioner</u>, 145 T.C. 161, 182 (2015), <u>aff'd</u>, 704 F. App'x 720 (9th Cir. 2017), this Court expressly agreed with the reasoning in <u>Planned Investments</u>, concluding that the sec. 6700 penalty is not necessarily tied to activities or amounts earned in a particular tax year and can be based on activities and amounts earned in other years.

[*72] For 2008 CMS earned gross receipts of $587,298.[19]  For 2009 the RA identified CMS' gross receipts as $933,674.  For 2010 the RA identified CMS' gross receipts as $742,473.  The RA then multiplied these amount by petitioner's ownership of shares in CMS, 16%, for tax years 2008, 2009, and 2010.  The RA then multiplied petitioner's proportionate share of the gross receipts by 50% as required by section 6700(a).  Respondent determined penalties against petitioner pursuant to section 6700 for tax years ending December 31, 2008, 2009, and 2010, of $46,984, $74,694, and $59,398, respectively.[20]  The penalties were appropriately assessed, accurately calculated, and respondent followed all administrative procedures.

IV.    Remaining CDP Issues

When the Court conducts a de novo review of an underlying liability, we review all determinations not involving the underlying liability for abuse of

---

[19]For 2008 the RA included only half the gross receipts in the penalty base for purposes of being conservative.

[20]Ultimately, respondent used a rather conservative formula for calculating the base amount for petitioner's penalties.  Petitioner was the sole shareholder of Xell at all times, and nearly all of Xell's income was derived from selling the Tool Program.  There is no clear reason why the gross income derived from participating in the sale of the CMS Tool Program should not include income petitioner derived from Xell.  See In re Tax Refund Litig., 766 F. Supp. 1248, 1258 (E.D.N.Y. 1991).

**[\*73]** discretion. <u>Craig v. Commissioner</u>, 119 T.C. 252, 260 (2002). An action

constitutes an abuse of discretion if it is arbitrary, capricious, or without sound

basis in fact or law. <u>Giamelli v. Commissioner</u>, 129 T.C. 107, 111 (2007). This

review is to ensure that the Appeals Office verified that the Commissioner

complied with the requirements of all applicable law and administrative

procedure, considered all relevant issues raised by the taxpayer, and considered

whether the proposed collection action balances the need for the efficient

collection of tax with the taxpayer's legitimate concern that the collection action

be no more intrusive than necessary.[21] <u>See</u> sec. 6330(c)(3).

The notice of determination sustained the collection action, with the caveat

that collection may not proceed until petitioner's refund claim was closed. The

only issue that petitioner raised during his CDP hearing was his underlying

liability. The SO addressed this issue. Further, the SO verified that the

assessment of the section 6700 penalty was timely and that petitioner received all

appropriate notices in this respect. Accordingly, petitioner does not allege, and we

---

[21]Petitioner did not request a collection alternative and failed to present necessary financial information for the SO to consider. <u>See</u> sec. 6330(c)(2)(A)(iii). The record shows the SO verified that the requirements of applicable law and administrative procedure were followed.

**[\*74]** do not hold, that the SO abused his discretion in arriving at any of these determinations.

V.    Conclusion

We have considered all the other arguments of the parties, and to the extent not discussed above, find those arguments to be irrelevant, moot, or without merit.

To reflect the foregoing,

Decision will be entered

for respondent.